IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 21, 2010 Session

**STATE OF TENNESSEE v. ALLEN DOANE**

**Appeal from the Circuit Court for Sevier County**
**No. 10690-II     Richard R. Vance, Judge**

**No. E2009-01374-CCA-R3-CD - Filed July 6, 2011**

The Defendant, Allen Doane, was indicted on four charges of aggravated sexual battery, a Class B felony. See Tenn. Code Ann. § 39-13-504. On April 25, 2007, the Defendant was convicted by a jury of four counts of sexual battery, a Class E felony. See Tenn. Code Ann. § 39-13-505. The trial court imposed a two-year sentence for each count and ordered all four counts to be served consecutively, for an effective sentence of eight years. The Defendant appealed to this court, and the case was remanded for a new sentencing hearing to determine the length of the sentences and whether they should be served concurrently or consecutively. See State v. Allen Doane, No. E2008-00125-CCA-R3-CD, 2009 WL 21032 (Tenn. Crim. App. Jan. 5, 2009). After a second sentencing hearing, the trial court again imposed two-year sentences for each count and ordered all four counts to be served consecutively, for an effective eight-year sentence. The Defendant then filed a petition for writ of habeas corpus alleging that the judgments in this case were void. Both matters were consolidated into this appeal. In this appeal as of right, the Defendant contends that (1) the judgments in this case are void because the statute of limitations expired prior to the commencement of the prosecution and (2) the trial court erred by imposing consecutive sentences. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. MICHAEL SWINEY, Special Judge of the Court of Appeals sitting by designation, joined.

G. Scott Green, Knoxville, Tennessee, for the appellant, Allen Doane.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel; James B. Dunn, District Attorney General; and Steven R. Hawkins, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

*I. Evidence at Trial*

The victim, B.N.,[1] testified at trial[2] that she was born on July 23, 1989 and was a senior in high school. According to B.N., the Defendant lived next door to her and was her step-mother's step-father. However, B.N. testified that she loved the Defendant and viewed him as her own grandfather. The Defendant had a hot tub at his house which B.N. would use on a regular basis. The Defendant would also occasionally take B.N. with him "when he was working on houses." On one of these occasions, the Defendant began tickling B.N., causing her to fall to the floor, where "he started licking and kissing on [B.N.'s] leg all the way up to [her] crotch area." B.N. pushed the Defendant's head away, but he then "kissed on [her] stomach and [the Defendant] went down and . . . pull[ed] [her] shorts down . . . but not all the way" until she pushed him away and told him to stop. B.N. testified that the Defendant did not say anything to her and stopped after she told him to stop.

B.N. testified that she recalled four specific incidents that occurred in the summer of 1999, the fall of 1999, the winter of 2000, and the spring of 2000 where the Defendant "would rub [his foot] on [her] crotch" while they were in the hot tub. According to B.N., on these occasions, the Defendant "would rub [his foot] back and forth" on the area of her vagina. However, the Defendant's foot never went underneath B.N.'s bathing suit. B.N. testified that she could tell the Defendant was touching her intentionally because "it was done repeatedly" and "[i]t wasn't like it was just a second and then he moved his foot." Instead, the Defendant "was rubbing his toes" on her vagina. The Defendant would do this until B.N. got out of the water or got "where [she] was away from him." B.N. would "try to get away" from the Defendant when his foot touched her because "it was uncomfortable and [she] knew that [she] wasn't supposed to be touched there." B.N. testified that when each of these

---

[1]This court refers to victims of sexual battery by their initials.

[2]The trial transcript was not included in the record of the Defendant's original appeal, and the factual background in that opinion was drawn from the Defendant's presentence report. We are able to discuss the factual background in more detail because the transcript of the trial was made an exhibit at the hearing on the Defendant's petition for writ of habeas corpus.

incidents occurred, she was in the hot tub with the Defendant and her "step-cousins." However, B.N. testified that no one could see underneath the surface of the water when the hot tub's jets were on and that her step-cousins "were all little and wouldn't have any perception" of what the Defendant was doing to her. B.N.'s step-mother also testified that no one could see beneath the water when the hot tub's jets were on.

B.N. testified that she did not tell anyone about what the Defendant had done to her at that time because she "was scared that [the Defendant] would be mad or that they wouldn't believe me." In 2004, B.N.'s biological mother asked her if the Defendant had ever touched her inappropriately. B.N. told her biological mother about what the Defendant had done to her. B.N.'s biological mother took her to talk to a lawyer. After speaking with an attorney, B.N. told her step-mother about what the Defendant had done to her. On cross-examination, B.N. admitted that she never told the Defendant to stop or said "anything to anybody" about what the Defendant had done to her. B.N. also admitted that the Defendant had never threatened her or told her not to tell anyone about what he had done.

B.N.'s step-mother, J.N.,[3] testified that in July 2004, B.N. told her that the Defendant "had been making sexual advances toward her for some time." According to J.N., at that time, B.N. did not tell her about what occurred in the hot tub. B.N. also testified that she did not initially tell J.N. about what had occurred in the Defendant's hot tub. J.N. testified that the Defendant called her that night "to let [her] know that he was leaving home and that he would not be around [her] girls." However, the Defendant wanted to speak to J.N. the next day. The Defendant spoke with J.N. on her front porch and, according to J.N., the Defendant apologized for what he had done and "said everything that [B.N.] had said was pretty much true . . . [and] the only thing that was not covered was the fact about the hot tub." J.N. testified this was the first time she had heard about anything taking place in the hot tub. According to J.N., the Defendant told her that "he would intentionally try to place his foot [] where it would get bumped into." The Defendant told J.N. that "he had a problem" and that "he had for a long time a drinking problem and God took that away from him and he knew that God would help him with this problem."

Jason Seaton, the Defendant's step-son, testified that the Defendant purchased the hot tub on his behalf to help him recover from an accident that left him paralyzed. Mr. Seaton testified that the hot tub was just outside the window of a small apartment where he "spent ninety percent of [his] time . . . when [he] lived [with the Defendant]." Mr. Seaton never saw anything improper occur in the hot tub, and no one ever gave Mr. Seaton the impression that anything improper had occurred.

---

[3] J.N. later testified at the sentencing hearing that the Defendant "inappropriately touched" her when she was a child. Because J.N. is also a victim of sexual battery, we will refer to her by her initials.

Beverly Doane, the Defendant's wife, testified that she never saw the Defendant acting inappropriately with B.N. Ms. Doane also testified that she never heard anyone, including B.N., complain about the Defendant's behavior toward B.N. until these allegations were made in 2004. Shortly after B.N. told her step-mother about what the Defendant had done to her, Ms. Doane picked up B.N. and took her to church. According to Ms. Doane, during the car ride, B.N. told her "that she had no problem being around [the Defendant], [and] that nothing had happened." Ms. Doane also testified that B.N. told her it was her biological mother "that's got her tail up in the air about all this but [B.N.] had no problem . . . being around [the Defendant]." Ms. Doane admitted on cross-examination that she never reported B.N.'s alleged denial to anyone. B.N. testified that she did "not remember ever telling [Ms. Doane] that it didn't happen." B.N. also testified that Ms. Doane pressured her to recant her story and told her "that we can be normal again" if she recanted.

The Defendant denied ever touching B.N.'s vagina, stating that he had "maintained from day one that [he] did not touch her in her private area in any way, shape, form or fashion." The Defendant testified that he was never in the hot tub alone with B.N. and that one time while the kids were in the hot tub, he "stuck [his] foot over to [B.N.] knowing she was going to sit on it just to be [] goofing off." The Defendant denied that there was any sexual purpose to this action and testified that "[a]s soon as B.N. sat on [his foot] it hurt . . . and she jump[ed] up." The Defendant admitted that he took B.N. with him to a roofing job so that if he fell off he "could at least have somebody calling for help." The Defendant testified that he went into the house with B.N. because he had black tar, caulk, and paint on his hands and wanted to "clean [his] hands up." The Defendant admitted that he tickled B.N. and gave her "moo kisses." The Defendant explained that a "moo kiss" was when he would "go moo like a cow and just an old big sloppy lick with [his] tongue." However, the Defendant denied pulling down B.N.'s shorts and licking and kissing her thighs and vagina. B.N. testified that she knew what a "moo kiss" was but that what the Defendant did to her that day "was different."

The Defendant testified that he voluntarily spoke with the police and that he volunteered to speak with the Department of Children Services but that J.N. told him not to. The Defendant denied confessing to J.N. when he spoke with her and denied telling her that he had a sex addiction or that he was seeking counseling for sex addiction. The Defendant testified that when he spoke to J.N., he had not slept in days and had been "on [his] hands and knees all day praying to the good Lord." According to the Defendant, the only thing he admitted to J.N. was that on one occasion, he had stuck his foot out, intending for B.N. to sit on it. The Defendant testified that when he told J.N. he "needed help," he was referring to the fact that he was "living in a truck" and had "lost [his] family." However, the Defendant admitted that he had numerous relatives he could have stayed with instead of living in his

truck. The Defendant also testified that the problem he told J.N. he was praying God would take away from him was the fact that his family had been torn apart by B.N.'s allegations.

The Defendant and his wife both provided testimony suggesting that the alleged acts occurred after 1999 and 2000. When asked to "[t]ell the jury . . . about the hot tub and the interactions with the kids who came over to play in the hot tub," Ms. Doane testified about her youngest granddaughter, G.N.,[4] who was born in 2002. Ms. Doane testified that G.N. "was two when all this came about" and that she "wanted to get in the hot tub about every night." When the Defendant was asked to tell the jury about the children playing in his hot tub, the Defendant testified that G.N. started using the hot tub when she was a year old. The Defendant testified that G.N. did not like the jets in the hot tub so they were usually off. When asked to describe "something [he] did with the kids called a boat ride" the Defendant responded that G.N. would hold his neck while he circled the hot tub. The Defendant, when asked by the State how old the other children in the hot tub with B.N. were, testified that G.N. was two or three. Based on the foregoing evidence, the jury acquitted the Defendant on all four counts of aggravated sexual battery and convicted him of four counts of the lesser-included offense of sexual battery.

*II. The First Sentencing Hearing*

At the first sentencing hearing, J.N. testified that she was six years old when the Defendant married her mother. J.N. testified that when she was in kindergarten, the Defendant "inappropriately touched [her] underneath [her] clothing" and that what "he did to [her] was ten times worse than what he [did] to [B.N.]" The Defendant would "touch and rub" J.N.'s vagina and forced her to touch his penis underneath his clothing. J.N. testified that this continued for two or three years until she told him to stop because what he had done was "making [her] sick inside." J.N. did not tell anyone about what the Defendant did "because [she] didn't honestly think he would admit to what he [had] done." At age 19, J.N. told her mother about the Defendant's abuse. J.N.'s mother confronted the Defendant and he "admitted to it." The Defendant "quit drinking" and "got into church" and J.N. "honestly thought he had changed."

C.M., a family friend, testified that she began working for the Defendant when she was 12 or 13 years old. On one occasion, C.M. was having lunch in the Defendant's truck when he "leaned up to [her] and started rubbing [her] inner thigh and started rubbing [her] panties." A year later, C.M. told the resource officer at her school what the Defendant had done to her. C.M. and her mother went to the police station, where the Defendant admitted

---

[4]Because G.N. is a minor we will refer to her by her initials in order to protect her privacy as well as the privacy of her sister, the victim.

that he had touched her and "cried and said he would never do it again and said he was a changed man." C.M.'s mother testified that Ms. Doane "begged [her] not to do anything" and told her that the Defendant "had changed and he was going to church and would never do it again." The Defendant and B.N.'s father also visited C.M.'s mother and asked her not to press charges because "he was sorry" and "would never do it again." C.M. testified that she and her mother believed the Defendant and decided not to press charges.

B.N.'s father testified that the Defendant's actions had "completely devastated [his] family." B.N.'s father admitted that he knew the Defendant had sexually abused J.N., but he "felt that [the Defendant] had been a changed man" and that he "never would have thought [the Defendant] would have ever hurt [his] child or any other child." A few weeks after B.N. first reported that the Defendant had touched her, the Defendant called B.N.'s father and "apologized for what he had done, [and] asked [B.N.'s father] to forgive him for what he had done." B.N.'s father testified that in 1999 and 2000, B.N. "was going through a spell . . . where she didn't want to take a shower" and "wouldn't wash her hair." B.N.'s father also testified that during the two years prior to the trial, B.N. was in counseling "on and off with a therapist trying to address the issues and trying to keep her from self-destructing."

Tom Winsted testified that he knew the Defendant from the "Celebrate Recovery" group at the First Baptist Church in Sevierville. According to Mr. Winsted, the group helps people deal with their "hurts, habits, and hang-ups." Mr. Winsted described the group as having "the same background as [Alcoholics Anonymous] but . . . more Christian." Mr. Winsted testified that there was not a licensed therapist working with the group. Instead, "everybody [in the group] shares and [] work[s] with each other." Mr. Winsted testified that the Defendant "was at the first meeting and has been at every meeting" since the group started. However, Mr. Winsted later admitted the Defendant actually had missed some meetings "if he is on vacation or something like that."

Marlena Foshey testified that she knew the Defendant from the "Celebrate Recovery" group which she facilitated. Ms. Foshey testified that she had "a degree in adolescent and clinical psychology." At the time of the sentencing hearing, Ms. Foshey worked at "Honey Baked Hams" but testified that she had previously been "a practicing psychologist for 13 years." Ms. Foshey admitted that her license had previously been revoked for six years. When asked if she was "a licensed psychologist with . . . at least some emphasis on sexual situations," Ms. Foshey responded that she was "not an expert, but [she] [had] knowledge."

Ms. Foshey testified that the Defendant had been in counseling for his "addiction" for "eight years on and off" and that during that time, the Defendant had not "relapsed."

According to Ms. Foshey, the relapse rate for people who left the "Celebrate Recovery" program was "at least 90 percent;" therefore, the Defendant had a high chance of relapse if he were to be sentenced to imprisonment. However, Ms. Foshey believed that if the Defendant was put on probation and allowed to remain in the "Celebrate Recovery" group, his likelihood of "re-offending [was] slight to nonexistent." Ms. Foshey testified that the Defendant had such a high likelihood of success because he was "honest," had "humbled himself," had been "forthright," and had "been broken" and "rebuilt" by God. Ms. Foshey concluded that in her opinion "as a Christian, as a victim and as a survivor of sexual abuse," the Defendant "no longer [had] the capacity to harm another person." In contrast, the psychosexual evaluation of the Defendant concluded that the Defendant had "an enduring attraction to young girls" and that if the Defendant were to remain in the community he should be placed on supervised probation.

At the sentencing hearing, the Defendant admitted that he had touched B.N. for "sexual purposes." The Defendant admitted that he lied during his trial testimony and explained that he lied because of "the shame [of] having to tell my family" and his wife that he had inappropriately touched another young girl. The Defendant also admitted that he had touched J.N. and C.M. like they had described in their testimony. However, the Defendant denied that there had been any other victims since B.N. in 2000. The Defendant testified that from 2000 to 2004, he was in group therapy for "sexual addiction" and that he "was pretty regular" in attending the therapy sessions. According to the Defendant, he was treated by Dr. Berry from 2004 to 2005. The Defendant testified that he stopped his treatment when he began participating in the "Celebrate Recovery" program to deal with his "hurts, habits, and hang-ups." The Defendant asked the trial court to place him on probation because "there's never been any trouble outside of my home or close by . . . nothing happened out in the public." When asked by the State if B.N. was 11 when the Defendant touched her, the Defendant responded that "that's what you all said" and that he "had no way of proving that . . . [he] honestly thought she was older than that." Additionally, the Defendant testified that he had not "acted out" since he touched B.N. three years before, in 2004. The Defendant also submitted a letter to the trial court in which he stated that B.N. "was 14 at the time of the hot tub."

In sentencing the Defendant, the trial court concluded that the following enhancement factors applied: (1) the Defendant had a history of previous criminal conduct and (14) the Defendant abused a position of private trust. See Tenn. Code Ann. § 40-35-114. The trial court based its conclusion that the Defendant had a history of previous criminal conduct on the testimony of J.N. and C.M. as well as the Defendant's admission of that conduct at the sentencing hearing. The trial court concluded that these enhancement factors "far outweigh[ed] the mitigation factors" of the Defendant's work history, community involvement, and good reputation and imposed the maximum two-year sentence on each

count. The trial court denied alternative sentencing based upon the need to avoid depreciating the seriousness of the offense, the fact that the Defendant had committed this type of crime previously, and the fact that the Defendant lied at trial. The trial court also concluded that the Defendant was "an offender whose record of criminal activity is extensive" and ordered all four sentences to be served consecutively, for an effective eight-year sentence. See Tenn. Code Ann. § 40-35-115(b)(2).

### III. Defendant's First Appeal

Following the trial court's sentencing decision, the Defendant appealed to this court contending that "(1) the two year-sentences [were] excessive; (2) the [trial] court erred in denying alternative sentencing; and (3) consecutive sentencing [was] not warranted." Doane, 2009 WL 21032 at *1. A panel of this court concluded that the trial court did not err by denying the Defendant alternative sentencing because "the circumstances of the offense [were] reprehensible and the nature of the offense outweigh[ed] the positive factors in favor of an alternative sentence." Id. at *9. However, these crimes occurred prior to the 2005 amendment to the Sentencing Act; therefore, the trial court improperly applied the enhancement factor that the Defendant abused a position of private trust because that fact had not been determined by a jury. Id. at*5. Accordingly, the case was remanded for the trial court to "determine the appropriate weight to be given" to the enhancement factor of the Defendant's prior criminal conduct "in determining the sentence length." Id. at *6. This court also concluded that Tennessee Code Annotated section 40-35-115(b)(2) did not justify consecutive sentences in this case because "we [could] not conclude that uncharged acts constitute 'an extensive record of criminal activity.'" Id. at *10. However, the case was remanded for the trial court to determine whether consecutive sentences were appropriate under the child sexual abuse factor in Tennessee Code Annotated section 40-35-115(b)(5). Id. at *10-11.

### IV. The Second Sentencing Hearing

No new evidence was presented at the second sentencing hearing. Following the arguments of counsel, the trial court assigned "great weight" to the Defendant's previous history of criminal conduct and concluded that it "far outweigh[ed] the mitigating factors." Accordingly, the trial court again sentenced the Defendant to the maximum two-year sentence for each count. Regarding consecutive sentencing, the trial court concluded that section 40-35-115(b)(5) applied to the case and justified consecutive sentences on all four counts for an effective eight-year sentence. In so concluding, the trial court stated

> In this case these minor victims were his family. It was a close family relationship up until these offenses came to light, that he had the trust of the

victims, that he abused that trust and . . . [that] is very relevant with respect to the aggravation of these offenses due to the close relationship between [the Defendant] and these child victims, that the offenses occurred over a lengthy period of time, as supported by the record, that it was not an isolated incident but showed a continuing intent on the part of this [D]efendant to commit these crimes.

The [trial court] heard testimony that the child had [] to undergo counseling that affected her emotionally as it affected the older victim, for which he was not charged, the lifetime of suffering. And [as it] is pointed out in the statute, the nature and scope of the sexual acts in the extent of the residual, physical and mental damage to the victim or victims were all shown conclusively to the [trial court's] satisfaction.

*V. The Defendant's Petition for Writ of Habeas Corpus*

After the trial court entered the Defendant's new sentence, the Defendant filed a petition for writ of habeas corpus. In the petition, the Defendant contended that the prosecution for the offenses did not commence until after the two year statute of limitations had expired. See Tenn. Code Ann. § 40-2-101(b)(4). The Defendant noted that the judgments in this case list the dates of the offenses as occurring in 1999 and 2000. However, the prosecution of the Defendant did not begin until 2005. Therefore, the petition concluded, the judgments against the Defendant were void. On March 23, 2010, the trial court held a hearing on this issue.

At the hearing, the State argued that the prosecution of the Defendant was timely pursuant to Tennessee Code Annotated section 40-2-101(g), which provides that prosecution for the offense of sexual battery committed against a child "shall commence no later than the date the child reaches [21] years of age." The Defendant responded that he had been acquitted of aggravated sexual battery, which required proof that the victim was less than 13 years of age, but convicted of the lesser included offense of sexual battery, which has the exact same elements of aggravated sexual battery except for the age of the victim. See Tenn. Code Ann. §§ 39-13-504, 505. The Defendant argued that this meant the jury failed to believe B.N.'s testimony about her age; therefore the State failed to prove B.N. was a minor. The Defendant concluded that section 40-2-101(g) did not extend the statute of limitations beyond the normal two years for a Class E felony.

Following the arguments of counsel, the trial court dismissed the Defendant's petition for habeas corpus. In so concluding, the trial court stated,

[T]his question was not raised at trial, it was not raised in a motion for a new trial, it was not raised on direct appeal. All of these opportunities to raise the issue of the age and the statute of limitations were available to this [D]efendant at each and every stage. No objection was raised. Direct testimony of this child's age was adduced on the record, and to claim that somehow this was not a child victim within the meaning of the statute would be to totally ignore the facts of the case . . . . The jury did give some benefit to [the Defendant] by its verdict in convicting him of a lesser included offense, but that benefit only extends so far.

[The trial court concluded] that this was a child victim within the meaning of the statute extending the statute of limitations beyond the period of time argued, and that the prosecution was timely, that [the Defendant] was put on notice by the indictment itself alleging the age of the victim, the testimony adduced at trial, his own testimony, and numerous opportunities to raise that issue during the course of the proceedings and on appeal. This case has been on appeal. It's been heard by the Court of Appeals already, and the convictions affirmed. So, therefore, let the motion be respectfully denied.

Following the trial court's ruling, the Defendant consolidated this matter with the appeal of the trial court's new sentence.

## ANALYSIS

### I. Statute of Limitations

The Defendant contends that the trial court erred by dismissing his petition for writ of habeas corpus. The Defendant argues that Tennessee Code Annotated section 40-2-101(g) cannot extend the statute of limitations in this case because the State failed to plead and prove that B.N. was a minor when the crimes were committed. Therefore, the normal two-year statute of limitations for Class E felonies should have been applied to this case. See Tenn. Code Ann. § 40-2-101(b)(4). The Defendant concludes that the judgments in this case are void because the prosecution was not commenced until 2005 even though the offenses occurred in 1999 and 2000. The State responds that the Defendant's claim is not cognizable in a habeas corpus proceeding because the statute of limitations in criminal cases is "waivable, rather than jurisdictional." The State further responds that section 40-2-101(g) does apply to this case and that the Defendant's prosecution was timely commenced under section 40-2-101(g). In response to the State's argument, the Defendant contends that because the statute of limitations is a "substantial right" it is jurisdictional; therefore, failure

-10-

to prosecute within the applicable statute of limitations makes a judgment void on its face, subjecting it to habeas corpus review.

Under Tennessee law, the "grounds upon which habeas corpus relief may be granted are very narrow." Taylor v. State, 995 S.W.2d 78, 83 (Tenn. 1999). The writ will issue only in two specific circumstances where the petitioner has established: (1) a lack of jurisdiction for the order of confinement on the face of the judgment or in the record on which the judgment was rendered; or (2) that he is otherwise entitled to immediate release because of the expiration of his sentence. See State v. Ritchie, 20 S.W.3d 624, 630 (Tenn. 2000); Archer v. State, 851 S.W.2d 157, 164 (Tenn. 1993). The purpose of the habeas corpus petition is to contest a void, not merely a voidable, judgment. State ex rel. Newsom v. Henderson, 424 S.W.2d 186, 189 (Tenn. 1968). A void, as opposed to a voidable, judgment is "one that is facially invalid because the court did not have the statutory authority to render such judgment." See Summers v. State, 212 S.W.3d 251, 256 (Tenn. 2007). A petitioner bears the burden of establishing a void judgment or illegal confinement by a preponderance of the evidence. See Wyatt v. State, 24 S.W.3d 319, 322 (Tenn. 2000).

Tennessee courts originally maintained that once the statute of limitations had elapsed, trial courts no longer had subject matter jurisdiction over the offense. See State v. Seagraves, 837 S.W.2d 615, 621 (Tenn. Crim. App. 1992); State v. David Patrick Pearson, No. 03C01-9103CR87, 1992 WL 70547, at *4 (Tenn. Crim. App. April 9, 1992). However, in State v. Pearson, the Tennessee Supreme Court expressly rejected the notion that the expiration of the statute of limitations was jurisdictional. 858 S.W.2d 879, 887 (Tenn. 1993). Instead, the supreme court "conclude[d] that the better reasoned rule is to treat the statute of limitations as waivable, rather than jurisdictional, but to require that the waiver be knowingly and voluntarily entered." Id. Our supreme court also concluded that "the protection against prosecution provided by a statute of limitation may not rise to the level of a fundamental right" but chose "to apply the same standard applied in determining whether there has been an effective waiver as to fundamental rights." Id. (citing Miranda v. Arizona, 384 U.S. 436 (1966); Johnson v. State, 834 S.W.2d 922 (Tenn. 1992) (guilty plea must be knowing and voluntary)). Accordingly, "a waiver of the statute of limitations will not be presumed where there is no evidence in the record to indicate that the defendant was made aware of the issue." Id.

The Tennessee Supreme Court's opinion in Pearson expressly rejected this court's reasoning that the expiration of the statute of limitations removed subject matter jurisdiction from the trial court. Pearson, 858 S.W.2d at 887. Instead, the supreme court treated the statute of limitations as waivable, but required it be a knowing and voluntary waiver. Id. Similarly, a defendant's Miranda rights may be waived if the waiver is knowing and voluntary. 384 U.S. at 436. Likewise, a guilty plea must be knowingly and voluntarily

-11-

entered into. Johnson, 834 S.W.2d at 922 . However, neither a violation of Miranda rights nor an allegation that a guilty plea failed to be knowingly or voluntarily entered into are cognizable in a habeas corpus proceeding. See Archer v. State, 851 S.W.2d 157, 158 (Tenn. 1993) (concluding "that the reach of the Great Writ is severely restricted in this state and would, in almost all instances, preclude consideration of challenges to the voluntariness of guilty pleas in such proceedings."); Rudolph Powers v. State, No. M2009-00937-CCA-R3-HC, 2010 WL 27948, at *1 (Tenn. Crim. App. Jan. 6, 2010), perm. app. denied (Tenn. May 12, 2010) (concluding that a petitioner's claim that he was denied his Miranda rights "would render the judgments voidable, not void."). Accordingly, we conclude that a claim that the statute of limitations has expired is likewise not cognizable in a habeas corpus proceeding.

Moreover, the prosecution of the Defendant was commenced within the applicable statute of limitations. The Defendant is correct in his assertion that "where the indictment is brought after the period of limitations has expired, it must be pleaded and proved that certain specific facts toll the statute of limitations." State v. Davidson, 816 S.W.2d 316, 318 (Tenn. 1991). Examples of situations when the statute of limitations is tolled include when the defendant "conceals the fact of the crime" or when the defendant is absent from the state. See Tenn. Code Ann. § 40-2-103. Instead of tolling the statute of limitations, section 40-2-101(g) provides that "[p]rosecutions for any offense committed against a child . . . that constitutes a criminal offense under the provisions of [§ 39-13-505] . . . shall commence no later than the date the child reaches [21] years of age." Tennessee Code Annotated section 39-11-201(f) provides the appropriate burden of proof for the issue of whether a prosecution was timely commenced. Under the statute, "time limitations need be proven only in cases where those issues are raised by the defendant" and once raised, "the state must prove . . . timely prosecution by a preponderance of the evidence." Tenn. Code Ann. § 39-11-201(f), Sentencing Comm'n Cmts.

The Defendant contends that because the jury acquitted him of all four counts of aggravated sexual battery, it rejected B.N.'s testimony regarding her age. As the Defendant asserts, the age requirement was the only difference between the elements of aggravated sexual battery and the elements of sexual battery. The Defendant contends that the jury specifically rejected B.N.'s testimony about her age by finding that she was not younger than 13 at the time of the offense and that there is nothing in the record to show the State pled or proved B.N. was at least 13 but less than 18 years of age at the time of the offense. However, the more reasonable conclusion from the jury's verdict is that it chose to accredit the Defendant and Ms. Doane's testimony that the offense occurred sometime after G.N.'s birth in 2002, making B.N. 13 or older. When asked about the children in the hot tub with B.N., both the Defendant and his wife testified that G.N. was present. The Defendant was clear in his testimony at the sentencing hearing that he believed B.N. was at least 13 when these offenses occurred.

Furthermore, the State proved by a preponderance of the evidence that the prosecution was timely commenced. B.N. testified that she was born in 1989 and that at the time of trial, she was a senior in high school. The Defendant did not present any evidence to contest B.N.'s date of birth. Whether these offenses occurred in 1999 and 2000 as alleged by the State or sometime between 2002 and 2005 as was suggested by the Defendant's testimony, B.N. was under 18. The State established by a preponderance of the evidence, as required by Tennessee Code Annotated section 39-11-201(f), that B.N. was a minor at the time of the offense and that the prosecution was commenced before she turned 21. Accordingly, we conclude that this issue has no merit and affirm the decision of the trial court dismissing the Defendant's petition for writ of habeas corpus.

## II. Consecutive Sentencing

The Defendant presents four arguments as to why he believes consecutive sentencing[5] is inappropriate in this case. The Defendant contends that (1) Tennessee Code Annotated section 40-35-115(b)(5) should only apply to an offense where the age of the victim is a statutory element of the offense; (2) the State failed to present sufficient evidence that the victim had suffered residual, physical and mental damage as a result of the Defendant's actions; (3) the trial court made no finding "regarding how the nature and scope" of the Defendant's actions "was aggravated beyond that which is inherent in sex crimes;" and (4) the trial court erroneously considered the impact of the Defendant's crimes on persons other than the victim.

### A. Age of the victim

The Defendant contends that the wording of section 40-35-115(b)(5) requires that a defendant be convicted of two or more offenses in which the minority of the victim is a statutory element of the offense. The Defendant argues that the phrase "statutory offenses involving sexual abuse of a minor" must be interpreted as requiring the convictions be for offenses which have the minority of the victim as a statutory element. The Defendant further relies on State v. Taylor, 739 S.W.2d 227 (Tenn. 1987), to contend that the minority of the victim must be a statutory element of the convicted offenses before section 40-35-115(b)(5) may be applied. The State responds that this court has repeatedly affirmed consecutive sentences under section 40-35-115(b)(5) for sexual battery and other offenses in which the minority of the victim was not an element of the offense. The State further responds that the plain language of section 40-35-115(b)(5) does not limit itself to only those offenses in which the minority of the victim is an element of the offense. The State argues that in other

---

[5]The Defendant does not challenge the length of the sentence imposed by the trial court in this appeal and has therefore waived the issue. Tenn. R. App. P. 13(b).

sentencing contexts, the General Assembly has used the term "statutory elements" when limiting the application of a statute to offenses with specific elements. Additionally, the State responds that in regard to juvenile courts, the General Assembly has defined the term "child sexual abuse" to include the offense of sexual battery when the victim is a minor.

The State is correct that this court has, on numerous occasions, affirmed consecutive sentences under section 40-35-115(b)(5) for offenses in which the minority of the victim was not an element of the offenses. See State v. Brandon Raymond Bartee, No. M2004-02637-CCA-R3-CD, 2005 WL 2333609, at *3-4 (Tenn. Crim. App. Sept. 20, 2005), perm. app. denied (Tenn. Feb. 21, 2006) (affirming consecutive sentences for three counts of sexual battery); State v. Percy Brown, No. 01C01-9701-CR-00015, 1997 WL 688996, at *4-5 (Tenn. Crim. App. Nov. 5, 1997) (affirming consecutive sentencing for two counts of sexual battery); State v. Donald Wayne Castle, No. 03C01-9302-CR-00037, 1993 WL 317465, at *2-3 (Tenn. Crim. App. Aug. 23, 1993) (affirming consecutive sentencing for convictions of rape and attempted rape); State v. James W. Smith, No. 03C01-9107-CR-00226, 1992 WL 55568, at *2 (Tenn. Crim. App. March 24, 1992), perm. app. denied (Tenn. June 22, 1992) (affirming consecutive sentencing for rape and incest); State v. Michael Guess, No. 88-102-III, 1988 WL 123982, at *2-3 (Tenn. Crim. App. Nov. 22, 1988) (affirming consecutive sentencing for convictions of rape, incest, and sexual battery). However, the issue of whether the wording of the statute required the minority of the victim to be an element of the convicting offenses was not raised in any of these case and appears to be a question of first impression in this court.

The paramount rule of statutory construction "is to ascertain and give effect to legislative intent without broadening the statute beyond its intended scope." Carter v. Bell, 279 S.W.3d 560, 564 (Tenn. 2009) (citing State v. Sherman, 266 S.W.3d 395, 401 (Tenn. 2008)). Courts "must always begin with the words that the General Assembly has chosen" and "must give these words their natural and ordinary meaning." Lee Medical, Inc. v. Beecher, 312 S.W.3d 515, 527 (Tenn. 2010). These words must also be construed "in the context in which they appear in the statute and in light of the statute's general purpose." Id. Furthermore, "[s]tatutes relating to the same subject or having a common purpose should be construed together." Carter, 279 S.W.3d at 564 (citing Lawrence County Educ. Ass'n v. Lawrence County Bd. of Educ., 244 S.W.3d 302, 309 (Tenn. 2007)). If the statute's text is "clear and unambiguous, the courts need not look beyond the statute itself to ascertain its meaning." Beecher, 312 S.W.3d at 527. However, if the language of the text is ambiguous, courts "must resort to the rules of statutory construction and other external sources to ascertain the General Assembly's intent and purpose." Id. Additionally, we note that the General Assembly is presumed to be "aware of prior enactments and of decisions of the courts when enacting legislation." Carter, 279 S.W.3d at 564 (citing Ki v. State, 78 S.W.3d 876, 879 (Tenn. 2002)).

Section 40-35-115(b)(5) provides for consecutive sentences when the defendant

is convicted of two (2) or more statutory offenses involving sexual abuse of a
minor with consideration of the aggravating circumstances arising from the
relationship between the defendant and the victim or victims, the time span of
defendant's undetected sexual activity, the nature and scope of the sexual acts
and the extent of the residual, physical and mental damage to the victim or
victims.

The terms "statutory offenses," "involving," and "sexual abuse of a minor" are not defined
in the statute. The term "statutory offense" is generally defined as "[a] legal offense declared
by statute."[6] AMERICAN HERITAGE COLLEGE DICTIONARY 1351 (4th ed. 2004). In essence,
all criminal offenses in Tennessee are "statutory offenses." The word "involve" is defined
as "[t]o contain as a part; include" or "[t]o have as a necessary feature or consequence;
entail." Id. at 730. Considering these definitions, the statute requires two or more criminal
offenses which "have as a necessary feature" or "contain as a part" "sexual abuse of a
minor." However, it is not clear from the statute whether "sexual abuse of a minor" must be
a statutory element of the underlying offenses or whether minority may be inferred from the
facts of the underlying offenses.

The Sentencing Commission Comments note that section 40-35-115(b)(5) "was
derived from State v. Taylor." At issue in Taylor was whether consecutive sentences were
appropriate in "sexual abuse cases" where the facts did "not fall squarely within the
classifications defined in [Gray v. State, 538 S.W.2d 391 (Tenn. 1976)]."[7] 739 S.W.2d at
229. In Taylor, the defendant had been convicted of two counts of aggravated rape, which
included the minority of the victim as a statutory element of the crime. Id. at 227. However,
in deciding the issue, the supreme court examined in detail three cases decided by this court:
Morgan v. State, 582 S.W.2d 94 (Tenn. Crim. App. 1979), Vermilye v. State, 584 S.W.2d
226 (Tenn. Crim. App. 1979), and Bethany v. State, 565 S.W.2d 900 (Tenn. Crim. App.
1978). Id. at 229. In Bethany and Vermilye, the defendants were convicted of multiple
counts of violating Tennessee's statute prohibiting "crimes against nature," while in Morgan,
the defendant was convicted of one count of rape and one count of committing "a crime

_____

[6]Similarly, the term "statutory" is defined as "[o]f or relating to legislation" or "[l]egislatively created," while
the term "offense" is defined as "[a] violation of the law" or "a crime." BLACK'S LAW DICTIONARY 1186,
1547 (9th ed. 2009).

[7]The classifications defined by our supreme court in Gray were eventually codified and provide for
consecutive sentences when: (1) the defendant is a professional criminal; (2) the defendant has an extensive
record of criminal activity; (3) the defendant is "a dangerous mentally abnormal person;" and (4) the
defendant is "a dangerous offender." Tenn. Code Ann. §§ 40-35-115(b)(1)-(4), Sentencing Comm'n Cmts.

-15-

against nature." Id. Tennessee's statute prohibiting "crimes against nature" read in its entirety: "Crimes against nature, either with mankind or any beast, are punishable by imprisonment in the penitentiary not less than five (5) years nor more than fifteen (15) years." J.H. Rose v. Locke, 423 U.S. 48, 48 n.1 (1975).

While the "crimes against nature" statute did not require the minority of the victim as an element of the offense, our supreme court held that "the evidence of aggravating circumstances properly before the trial court for sentencing purposes in [Morgan, Vermilye, and Bethany] . . . fully justified the imposition of consecutive sentences." Taylor, 739 S.W.2d at 229-30. In the very next sentence of the opinion, the Tennessee Supreme Court concluded that it was "persuaded that it is necessary and appropriate to supplement the Gray classifications with one applicable to defendants convicted of two or more statutory offenses that involve sexual abuse of minors." Id. at 230. Accordingly, we conclude that the principle of law announced in Taylor, and eventually codified in section 40-35-115(b)(5), does not require that the minority of the victim be a statutory element of the convicting offenses in order to justify consecutive sentences. Instead, it is sufficient to show that the defendant was convicted of two or more offenses and that the facts of those offenses involved "sexual abuse of a minor."

We also agree with the State's contention that in other sentencing contexts, when the General Assembly has required courts to look to the statutory elements of an offense it has used the term "statutory elements." For example, the General Assembly has declared that "convictions for which the statutory elements include serious bodily injury, bodily injury, threatened serious bodily injury or threatened bodily injury to the victim or victims" are excepted from the general rule that multiple convictions within the same 24-hour period constitute only one prior conviction. See Tenn. Code Ann. §§ 40-35-106(b)(4), -107(b)(4), -108(b)(4). Similarly, one of the aggravating circumstances allowing for the imposition of the death penalty requires a finding that "[t]he defendant was previously convicted of one (1) or more felonies . . . whose statutory elements involve the use of violence to the person." Tenn. Code Ann. § 39-13-204(i)(2). Unlike these other contexts, the General Assembly did not require that the defendant must be convicted of two or more offenses whose statutory elements involve "sexual abuse of a minor" in order for section 40-35-115(b)(5) to be applicable.

Additionally, this court has previously relied on the definition of "child sexual abuse" provided in Tennessee Code Annotated section 37-1-602(a)(3), which applies to juvenile courts and proceedings, to determine how the term "sexual abuse of a minor" is defined for purposes of section 40-35-115(b)(5). See State v. Patrick M. Lonie, No. M2009-01894-CCA-R3-CD, 2010 WL 3516160, at *3-5 (Tenn. Crim. App. Sept. 9, 2010), perm. app. denied (Tenn. Feb. 16, 2011); State v. John Jason Burda, No. M2006-02523-CCA-R3-CD,

2009 WL 1181349, at *15-16 (Tenn. Crim. App. May 4, 2009), perm. app. denied (Tenn. Nov. 23, 2009) (both concluding that especially aggravated sexual exploitation of a minor constitutes "sexual abuse of a minor" for purposes of section 40-35-115(b)(5)). Section 37-1-602(a)(3)(B)(viii) defines "child sexual abuse" as being "the commission of any act involving the unlawful sexual abuse, molestation, fondling or carnal knowledge of a child under thirteen (13) years of age . . . [which] constitute[s] the criminal offense of . . . [s]exual battery under § 39-13-505." Similarly, Section 37-1-602(a)(3)(C)(iv) defines "child sexual abuse" to also mean "[t]he intentional touching of the genitals or intimate parts, including the breasts, genital area, groin, inner thighs, and buttocks, or the clothing covering them, of either the child or the perpetrator." (emphasis added). Based on all of the foregoing reasoning, we conclude that section 40-35-115(b)(5) applies to the Defendant and does not require as a prerequisite that the convictions have the minority of the victim as a statutory element.

### B. Evidence of the residual, physical and mental damage to the victim

The Defendant contends that consecutive sentences are inappropriate in this case because the State failed to present sufficient evidence that the victim had suffered residual, physical and mental damage as a result of the Defendant's actions. The Defendant contends that expert testimony is required in order to establish the extent of the residual mental damage to a victim of "sexual abuse." The Defendant notes that the only testimony provided at the sentencing hearing regarding B.N.'s residual mental damage was provided by her father, who was not a medical expert. The State responds that expert testimony is not required to establish the residual mental damage to a victim and that the testimony provided at the sentencing hearing was sufficient to establish that B.N. had suffered from such harm.

Section 40-35-115(b)(5) allows for consecutive sentencing once a defendant has been convicted of two or more "statutory offenses involving sexual abuse of a minor" and the trial court has considered several aggravating circumstances. One of the aggravating circumstances is "the extent of the residual, physical and mental damage to the victim or victims." Id. However, nothing in the plain language of the statute requires that this aggravating circumstance be proven by expert testimony. In fact, on several occasions this court has found the existence of residual harm based on testimony from the victim or other non-experts. See State v. Michael Martez Rhodes, No. M2009-00077-CCA-R3-CD, 2010 WL 5061016, at *4 (Tenn. Crim. App. Dec. 8, 2010), perm. app. filed (Tenn. Feb. 8, 2011) (affirming consecutive sentences where the victim testified she had sought "additional counseling" following the defendant's abuse, that the defendant's crimes had "ruin[ed] her life," and the trial court found other aggravating circumstances were present); State v. Floyd "Butch" Webb, No. E2002-01989-CCA-R3-CD, 2004 WL 199824, at *17 (Tenn. Crim. App. Feb. 3, 2004) (concluding that there was evidence of residual harm where the victim's

-17-

mother testified that the victim had attempted suicide, had scratched herself, and had been hospitalized as a result of the sexual abuse); State v. Steven Paul Deskins, No. M2002-01808-CCA-R3-CD, 2003 WL 21957083, at *8 (Tenn. Crim. App. Aug. 14, 2003), perm. app. denied (Tenn. Jan. 5, 2004) (concluding that the evidence established "the victim suffer[ed] significant emotional damage" where the victim's teacher and mother testified about "extreme changes in the victim's behavior [] correspond[ing] with the start of the abuse."); cf. State v. Hayes, 899 S.W.2d 175, 184, 187 (Tenn. Crim. App. 1995) (concluding that "the extent of residual damage to the victim" was not sufficiently shown where only evidence was a letter written by the victim's mother stating that "there had been a lot of 'tears and despair'" caused by the defendant's actions). Accordingly, we conclude that the testimony from B.N.'s father that she had gone through a period where she refused to bathe, had undergone personality changes, and had undergone counseling for issues related to the Defendant's abuse was sufficient to establish that B.N. had suffered residual harm as a result of the Defendant's crimes.

### C. Trial court's examination of the nature and scope of the sexual acts

The Defendant contends that the trial court failed to examine the nature and scope of the sexual acts and failed to make any "finding[s]" on that issue. The Defendant argues that the record "is devoid of any meaningful consideration of this factor." The State responds that there was sufficient evidence at trial to establish the nature and scope of the sexual activity and that the trial court properly considered this aggravating factor.

Section 40-35-115(b)(5) requires the trial court to give "consideration" to several aggravating circumstances, which include "the nature and scope of the sexual acts." At the second sentencing hearing, the trial court concluded "the nature and scope of the sexual acts in the extent of the residual, physical and mental damage to the victim or victims were all shown conclusively to the [trial court's] satisfaction." The statute does not require the State to present new evidence at the sentencing hearing regarding the nature and scope of the sexual acts nor does it require the trial court to provide a summary of the facts established at trial. B.N. testified in detail at trial about the nature and scope of the sexual acts. On four occasions over a span of two years, the Defendant rubbed his foot and toes on B.N.'s vagina while they were in the Defendant's hot tub. B.N. also testified that, on one occasion, the Defendant also licked and kissed her legs, stomach, and "crotch area." Accordingly, we conclude that there was sufficient evidence at trial to establish the nature and scope of the sexual acts and that the trial court properly considered this aggravating circumstance in its sentencing decision.

The Defendant also contends that because his actions were not as "egregious" as the actions of other defendants, the nature and scope of the sexual acts cannot justify consecutive

-18-

sentences. However, not all of the aggravating circumstances listed in section 40-35-115(b)(5) "must be present to support the imposition of consecutive sentencing." State v. James M. Powers, No. E2001-02363-CCA-R3-CD, 2002 WL 31387308, at *5 n. 4 (Tenn. Crim. App. Oct. 23, 2002), perm. app. denied (Tenn. March 10, 2003). Furthermore, consecutive sentences may still be appropriate under section 40-35-115(b)(5) even when one factor militates against them if the other aggravating circumstances have been established and carry sufficient weight. See State v. Matthew Kirk McWhorter, No. M2003-01132-CCA-R3-CD, 2004 WL 1936389, at *46 (Tenn. Crim. App. Aug. 30, 2004), perm. app. denied (Tenn. Oct. 19, 2009) (concluding that consecutive sentences were appropriate even though "[n]o evidence was presented of any 'residual, physical and mental damages to the victim'" when the other aggravating circumstances were all present). Accordingly, we conclude that there is no merit to this issue.

### D. Impact of crimes on persons other than the victim

The Defendant contends that the trial court improperly considered the impact his crimes had on persons other than the victim, B.N. The Defendant argues that the trial court's consideration of the impact of the Defendant's admitted, but uncharged, sexual acts against J.N. and C.M. was "not germane" to the determination of whether the Defendant deserved consecutive sentences for his crimes against B.N. The State concedes that "the pertinent inquiry is the impact on the 'victim or victims' to the 'offenses' on which the defendant was 'convicted.'" However, the State responds that the fact that "the trial court also took notice of the impact of the [D]efendant's prior, unindicted-yet-admitted offenses in no way undermines" the trial court's decision regarding consecutive sentencing.

The term "victim or victims" is not defined in section 40-35-115(b)(5). However, this court has defined the term "victim" as it is used in Tennessee Code Annotated section 40-35-114, which lists the enhancement factors to be considered in determining the length of a sentence. In that context, the term "victim" "is limited in scope to a person or entity that is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime." State v. Raines, 882 S.W.2d 376, 385 (Tenn. Crim. App. 1994). In sentencing the Defendant, the trial court analyzed the aggravating circumstances stating that "[i]n this case these minor victims were his family," that the Defendant "had the trust of the victims," that there was a "close relationship between [the Defendant] and these child victims," and that the Defendant's actions had affected B.N. "as it affected the older victim, for which he was not charged, the lifetime of suffering." In making its decision to impose consecutive sentences, the trial court considered information beyond the limits of section 40-35-115(b)(5). However, the record before this court contains the evidence submitted at trial, the evidence submitted at the sentencing hearings, the presentence report and pyschosexual evaluation, and all the information submitted to the trial court when it made its sentencing

determination. Accordingly, "[r]ather than sending the case back to the trial court for a new sentencing hearing, this [c]ourt exercises its jurisdiction pursuant to [Tennessee Code Annotated section] 40-35-401(d)" to determine whether consecutive sentences are appropriate in this matter. State v. Hicks, 848 S.W.2d 69, 71 (Tenn. Crim. App. 1992).

As discussed above, the Defendant was convicted of four "statutory offenses involving sexual abuse of a minor." Pursuant to section 40-35-115(b)(5), we must now consider "the aggravating circumstances arising from the relationship between the defendant and the victim . . ., the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim." The Defendant was the step-father to B.N.'s step-mother, and he lived next door to B.N. B.N. testified that she loved and trusted the Defendant like a grandfather and would visit his home and use his hot tub on a regular basis. This factor favors heavily for consecutive sentences. The Defendant touched B.N.'s vagina on four separate occasions over a two year period of time. The last incident occurred in 2000 and the Defendant's actions remained hidden until 2004. This factor also favors heavily for consecutive sentences. The nature and the scope of the Defendant's sexual acts neither favors for or against consecutive sentences in this matter. Regarding the residual mental damage caused to the victim, B.N.'s father testified that she had gone through a period where she refused to bathe, had undergone personality changes, and had to undergo counseling for issues related to the Defendant's abuse. This factor also favors for consecutive sentences. Accordingly, we conclude that consecutive sentences are warranted in this matter and affirm the sentences imposed by the trial court.

### CONCLUSION

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE