IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs at Knoxville August 26, 2020

## STATE OF TENNESSEE v. JUAN RAMON CHAVES-ABREGO[1]

**Appeal from the Circuit Court for Maury County**
**No. 25004     Stella L. Hargrove, Judge**

_____

### No. M2019-01686-CCA-R3-CD

_____

A Maury County Circuit Court Jury convicted the Appellant, Juan Ramon Chaves-Abrego, of one count of rape of a child, a Class A felony, and two counts of aggravated sexual battery, a Class B felony, and he received an effective forty-year sentence to be served at one hundred percent. On appeal, the Appellant contends that the evidence is insufficient to support the convictions and that the trial court erred by ordering consecutive sentencing. Based upon the record and the parties' briefs, we affirm the Appellant's convictions and effective sentence but remand the case to the trial court for correction of the judgment of conviction in count two, rape of a child, to reflect that the trial court sentenced the Appellant as a Range II offender.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed,**
**Case Remanded**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ALAN E. GLENN, J., joined.

John Michael Schweri, Columbia, Tennessee, for the appellant, Juan Ramon Chaves-Abrego.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Brent A. Cooper, District Attorney General; and Emily Crafton Hartman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I.  Factual Background

---

[1] We note that throughout the record, the Appellant's last name appears as "Chavez-Abrego," "Chaves-Abrego," and "Abrego-Chavez." However, we have chosen to use his last name as it appears in the indictment, "Chaves-Abrego."

In July 2016, the Maury County Grand Jury indicted the Appellant for aggravated sexual battery of K.S. in count one; rape of a child, K.S., in count two; and aggravated sexual battery of R.S., K.S.'s younger sister, in counts three and four.[2] The indictment alleged that the offenses occurred between April 1, 2015, and September 30, 2015, when K.S. was about nine years old and R.S. was about seven years old. The Appellant proceeded to trial in January 2019.

At trial, Michael Richmond testified that in 2016, he was a detective with the Columbia Police Department (CPD). On June 10, dispatch informed Detective Richmond that a person wanted to report a crime. Detective Richmond spoke with the victims' parents and arranged to meet with them the next day. During the meeting, the victims' stepfather told Detective Richmond that he and the Appellant had worked together and that the victims had spent "some time" at the Appellant's house. Detective Richmond referred the case to the Department of Children's Services (DCS), and a child psychiatrist interviewed the victims at Kid's Place on June 14. Detective Richmond watched the forensic interviews from a "remote location" as they occurred and later watched video recordings of the interviews.

Detective Richmond testified that the police "got very good details" about the crimes from the victims, particularly K.S. K.S. was able to tell the police about the clothing she was wearing and a movie that she watched. Based on the details, Detective Richmond thought K.S. was being truthful. Detective Richmond tried to talk with the Appellant several times at the trailer park where the Appellant lived but was never able to find him. The case against the Appellant was presented to a grand jury, and the Appellant was charged with aggravated sexual battery involving K.S., rape of a child involving K.S., and two counts of aggravated sexual battery involving R.S.

Detective Richmond testified that it was "very common for a child to wait a long time" before revealing abuse to an adult and that he did not refer the victims for a physical examination due to the amount of time that had passed between the offenses and the allegations. Detective Richmond said the indictment alleged that the offenses occurred sometime between April 1 and September 30 because the victims did not remember exact dates. The dates in the indictment were determined from the victims' parents, who provided information about when the victims last went to the Appellant's home, and from the victims, who provided details of the crimes for a timeline.

On cross-examination, Detective Richmond acknowledged that he did not personally interview the victims or the Appellant. He said that he tried to find the Appellant

---

[2] It is the policy of this court to refer to minor victims by their initials.

at the trailer park four or five times and that he went to the trailer park during the day. He said that he thought the Appellant was employed in construction and that he did not know if he tried to find the Appellant at the trailer park on a weekend. Detective Richmond said that he spoke with the Appellant's girlfriend, "Holly," several times but that "[i]t was very difficult to get [her] to talk to us." On redirect examination, Detective Richmond testified that at some point, the Appellant was incarcerated. However, the district attorney general advised Detective Richmond not to interview the Appellant in jail.

J.B., the victims' stepfather, testified that he had raised the victims for ten years.[3] At the time of the Appellant's trial, K.S. was twelve years old and R.S. was ten years old. J.B. and the Appellant had worked together in the landscaping business for four to six years. J.B. described their work as "seasonal," explaining that they worked together every day in the spring and summer months but that "when winter comes, he goes his way and does his winter job and I go my way and do my winter job." J.B. and the Appellant became friends, and J.B. knew the Appellant as "Alfredo."

J.B. testified that the Appellant's girlfriend, Holly, had a son and a daughter. Holly's daughter was "a little bit younger" than R.S., and the victims liked to play with her. The victims would ask to go to the Appellant's residence to play, and the Appellant stopped by J.B.'s house a couple of times and claimed that Holly's daughter wanted the victims to spend the night with her. The Appellant "had been background checked" for employment, so J.B. trusted the Appellant and allowed the victims to spend the night at the Appellant's home.

J.B. testified that in June 2016, he heard "something" about the Appellant and became concerned about the victims. J.B. spoke with his wife, and they decided to talk with the victims. J.B. asked the victims if anything had happened while they were spending the night at the Appellant's house. The victims "acted sad," and R.S. "wanted to change the subject." J.B. said that he knew "something had happened" and that he and his wife sent K.S. out of the room so they could talk to R.S. alone. R.S. "started crying," so J.B.'s wife telephoned the police. The next day, J.B. and his wife met with a detective. J.B. said that when he questioned the victims, the victims had not seen the Appellant or been to the Appellant's home in two to six months.

On cross-examination, J.B. testified that prior to the victims' allegations, he "thought a lot of" the Appellant and thought the Appellant was "a well established man that had made it from . . . Guatemala to America legally." The Appellant had "paperwork and ID" to show he was in the United States legally, and "he'd show it off all the time." J.B. stated that Holly's daughter spent the night at his house one or two times and that the

---

[3] In order to protect the identity of the victims, we will refer to the victims' parents by their initials.

victims said they slept in Holly's daughter's bedroom when they spent the night at the Appellant's home. At the time of the Appellant's trial, K.S. was being homeschooled due to bullying, and R.S. went to public school. J.B. described their grades as "[g]ood" and said they attended counseling. J.B. never talked with the Appellant about the victims' allegations. J.B. said that he had a prior felony conviction for theft and served six months in jail for a probation violation but that he no longer got into "trouble."

L.B., the victims' mother, testified that in June 2016, she "caught wind from somebody" that the Appellant had been arrested. L.B. mentioned the arrest to R.S., and R.S. immediately began "tearing up and turning away," which was abnormal. L.B. told J.B. that she thought they needed to talk with the victims. Later that night, L.B. and J.B. talked with R.S. alone and asked if anyone had touched her inappropriately. R.S. "immediately started crying and telling [them] what had happened." L.B. stopped R.S. from telling them everything because "it was hurtful to hear it" and because L.B. wanted the victims to talk with a professional about what had happened with the Appellant.

L.B. testified that she and J.B. then talked with K.S. alone and asked if anyone had touched her inappropriately. K.S. "didn't immediately start crying but she started doing her nervous habits" like fidgeting and looking at the floor. K.S. told them that the Appellant had touched her. L.B. said that J.B. and the Appellant were employed together for four years and that the Appellant came to their house "quite a few times." The Appellant's girlfriend, Holly, had a daughter about R.S.'s age, and the two families socialized together.

L.B. testified that at first, Holly's daughter would ask if the victims could spend the night with her. However, one time, the Appellant "showed up" alone at L.B.'s house and asked if the victims could spend the night. L.B. said that in hindsight, the Appellant's showing up at her house alone was "weird." Another time, the Appellant telephoned L.B. and asked if the victims could come to the Appellant's residence to "hang out" with Holly's daughter. L.B. said that Holly's daughter never spent the night at her house but that the victims spent the night at the Appellant's home a couple of times. At some point, though, R.S. stopped wanting to go to the Appellant's residence.

L.B. testified that after the abuse, R.S. would only spend the night at L.B.'s sister's house and that K.S. "has gotten into a depression." Rumors began spreading about K.S., and K.S. gained a lot of weight. L.B. said that prior to the abuse, K.S. had kidney problems and used catheters. Therefore, K.S. knew the difference between "inside" and "outside" her private area. L.B. said that her children would lie to her about issues such as doing their homework and cleaning their rooms but that they had never told her a story about someone touching their private areas.

- 4 -

On cross-examination, L.B. testified that she or the Appellant would drive the victims to the Appellant's home. Sometimes, the victims went separately to the Appellant's residence.

K.S. testified that she was in the seventh grade and was homeschooled. When K.S. was ten years old, her parents asked her if the Appellant had touched her inappropriately. K.S. told her parents that the Appellant had done something to her. K.S. told the jury that the Appellant was a "kind of like a family friend" and that the abuse happened about one and one-half years before she revealed it to her parents. K.S. identified the Appellant in the courtroom as "Alfredo."

K.S. testified that she and R.S. "frequently" spent the night at the Appellant's home because they liked to play with the Appellant's children and that the abuse happened twice to K.S. while they were spending the night. The first time, K.S. was in the kitchen and was baking cookies with the Appellant's "wife." When the Appellant's wife walked away, the Appellant "groped [K.S.] from the front." The State asked what K.S. meant by "groped," and she answered, "He touched my lower areas." K.S. said that the Appellant put one of his hands on her "privates" and that he "squeezed [her] front part." She acknowledged that by "privates," she meant where she went to the bathroom. K.S. was wearing pajama pants and a shirt, and the Appellant touched her front private over her clothes. He did not say anything to her. K.S. did not tell anyone about the incident because she was scared and did not think anyone would believe her.

K.S. testified that after the first incident, she and R.S. continued to go to the Appellant's home to play. K.S. said that she did not want to go but that she did so to be with R.S. K.S. said that in the second incident, she and R.S. went to spend the night and that they may have decorated a Christmas tree. That night, they watched a movie with the Appellant's children. R.S. was lying on the floor with the Appellant's son and daughter, and K.S. was "slouched" on the couch. The Appellant "came and sat behind" K.S., and he put his hand inside her pants. K.S. said that she was wearing silk shorts, a Dora the Explorer t-shirt, and underwear, and that the Appellant put his hand inside her underwear. K.S. said that the Appellant "moved his hand around and went inside of me," that the incident lasted one or two minutes, and that it "hurt." She stated that the Appellant did not say anything to her and that the other children may have been asleep.

K.S. testified that she and R.S. may have returned to the Appellant's residence after the second incident. However, the Appellant never did anything else to K.S. K.S. did not tell anyone about the second incident because she was scared. She also thought that if she did not say anything about it, "it would just go away." K.S. said that prior to the abuse, she thought the Appellant was "a good guy" and "a good father." His children were "super polite," and "all the kids loved him." After the abuse, though, K.S. thought "maybe

- 5 -

something [was] wrong" with the Appellant and that the Appellant "didn't know right from wrong." K.S. said she had never talked with a counselor about the abuse.

On cross-examination, K.S. testified that she went to the Appellant's home two or three times after the second incident and that she went to his home a total of five or six times. K.S. continued to go to the Appellant's residence because she had a "close" relationship with R.S. and because she wanted to make sure R.S. was "okay." The Appellant's daughter never spent the night at K.S.'s house. When K.S.'s revealed the abuse to her parents, her conversation with them lasted ten to fifteen minutes. They did not ask her a lot of questions, and she did not tell them everything that happened. On redirect examination, K.S. testified that she was "not sure" the second incident happened at Christmastime.

R.S. testified that she used to go to the Appellant's home to play with his daughter and that she spent the night sometimes. One time when R.S. was there, she was jumping on the Appellant's bed with the Appellant's son and daughter. K.S. and the Appellant's girlfriend were cooking in the kitchen. R.S. and the Appellant's daughter stopped jumping on the bed, and R.S. sat on the end of the bed. R.S. said that while she was sitting on the bed, the Appellant "put his hand in [her] pants" and touched her "private." She said that by "private," she meant the area "[t]o use the bathroom." R.S. said that she was wearing underwear and that the Appellant touched her skin but that she did not remember if his hand went inside her underwear. The Appellant's daughter also was sitting on the bed, and R.S. did not think the Appellant's son or daughter witnessed the incident. R.S. walked away from the Appellant, and she and the Appellant's daughter "kept playing and stuff." R.S. did not tell anyone about the incident because she was "too scared." That night, R.S. awoke to find the Appellant standing beside her. R.S. "looked away," and the Appellant "walked off." The next morning, R.S. telephoned J.B. and told him that she wanted to come home. J.B. asked R.S. if the Appellant could drive her home, but R.S. told J.B. to pick her up. R.S. said that when she got home, she was "frustrated" about what had happened with the Appellant.

R.S. testified that three or four months later, J.B. asked her about the Appellant. R.S. told her parents everything that had happened, and J.B. telephoned the police. R.S. never talked with the police about the incident, but she talked with a woman about it. R.S. told the woman everything that happened and was truthful. R.S. said that the Appellant touched her only one time, that he did not do anything else to her, and that she did not go back to the Appellant's home after the incident. R.S. identified the Appellant in the courtroom as "Alfredo."

On cross-examination, R.S. testified that she was in the fifth grade at the time of the Appellant's trial. K.S. was not always with R.S. when R.S. was at the Appellant's home.

- 6 -

At the conclusion of R.S.'s testimony, the State advised the trial court that it would be "nolleing" count four of the indictment, which charged aggravated sexual battery of R.S. The State rested its case and made the following election of offenses: count one, aggravated sexual battery, related to the incident in which K.S. was baking cookies in the Appellant's kitchen; count two, rape of a child, related to the incident in which K.S. was watching a movie; and count three, aggravated sexual battery, related to the incident in which R.S. was "jumping" on the bed. The Appellant did not present any proof, and the jury convicted him of all three counts as charged in the indictment. Following a sentencing hearing, the Appellant received an effective forty-year sentence.

## II. Analysis

### A. Sufficiency of the Evidence

The Appellant contends that the evidence is insufficient to support the convictions because the only evidence against him was the minor victims' testimony, because the State did not present any physical evidence to support their testimony, and because he did not admit to any wrongdoing. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the general standard of review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. <u>State v. Hall</u>, 976 S.W.2d 121, 140 (Tenn. 1998). "The [trier of fact] decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the [trier of fact].'" <u>State v. Rice</u>, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting <u>Marable v. State</u>, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" <u>State v.</u>

Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

As charged in this case, rape of a child is the unlawful sexual penetration of a victim by a defendant if the victim is more than three years old but less than thirteen years old. Tenn. Code Ann. § 39-13-522(a). "'Sexual penetration' means sexual intercourse . . . or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body, but emission of semen is not required[.]" Tenn. Code Ann. § 39-13-501(7). Aggravated sexual battery is "unlawful sexual contact with a victim by the defendant or the defendant by a victim" and the victim is less than thirteen years old. Tenn. Code Ann. § 39-13-504(a)(4). Tennessee Code Annotated section 39-13-501(6) provides:

> "Sexual contact" includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]

Taken in the light most favorable to the State, the evidence shows that K.S. and R.S. often spent the night at the Appellant's home so they could play with his daughter. The victims testified about three incidents of sexual abuse during those visits. In one incident, the Appellant put his hand on K.S.'s front "privates" and "squeezed" her privates over her clothes while she was in the kitchen baking cookies. In the second incident, the Appellant put his hand inside K.S.'s underwear while she was watching a movie, moved his hand around inside her underwear, and "went inside of [K.S]." In the third incident, the Appellant put his hand inside R.S.'s pants and touched her "private" while she was sitting on his bed. R.S. said that the Appellant touched her skin but that she did not remember if he put his hand inside her underwear. Detective Richmond explained that given the amount of time that had passed between the offenses and the victims' allegations, no physical evidence was collected in this case. L.B. testified that K.S. had experience with catheters and that K.S. understood the difference between "inside" and "outside" her private areas. The jury, as was its prerogative, accredited the minor victims' testimony, finding that the Appellant had unlawful sexual contact with K.S.'s vaginal area, that he penetrated K.S.'s vaginal area, and that he had unlawful sexual contact with R.S.'s vaginal area. We conclude that the evidence is sufficient to support the convictions.

## B. Sentencing

The Appellant contends that the trial court erred by ordering that he serve one of the ten-year sentences consecutive to the thirty-year sentence because there were insufficient "aggravating circumstances" to warrant consecutive sentencing. He also contends that his effective forty-year sentence, which the trial court ordered that he serve consecutive to a previous thirty-year sentence, was not justly deserved in relation to the offenses, equated to a sentence of life without parole, and was "unjustly disparate" from other offenders convicted of rape of a child. The State argues that the trial court properly ordered consecutive sentencing. We agree with the State.

At the sentencing hearing, Amanda Philyaw of the Tennessee Board of Probation and Parole testified for the State that she prepared the Appellant's presentence report. Ms. Philyaw had prepared a presentence report for the Appellant in a previous case, so she spoke with him briefly to prepare the report for this case. The Appellant claimed that J.B. lied, that J.B. "filed the charges" against him because they had a "disagree[ment]," and that J.B. promised the Appellant that the Appellant would be deported. Ms. Philyaw also spoke with the victims' parents, J.B. and L.B. J.B. told Ms. Philyaw that the victims had nightmares and that their trust in men had "[gone] down dramatically." J.B. also told Ms. Philyaw that he had to "pull" K.S. out of school and homeschool her and that he wanted the Appellant to receive the maximum sentence.

Ms. Philyaw testified that as part of the Appellant's presentence report, a "Strong R" assessment was completed, and the Appellant filled out a "VASOR" questionnaire. Both of the assessments scored the Appellant as a "low" risk to reoffend. The trial court asked Ms. Philyaw if the Appellant's low risk to reoffend "makes any sense to you." Ms. Philyaw answered, "It does not." She acknowledged that K.S. and R.S. were the Appellant's second and third victims and that the Appellant had an upcoming trial for an alleged fourth victim. Ms. Philyaw said that the Appellant told her that he graduated from high school but that he told "the prison that he dropped out in second grade." She said she could not verify the Appellant's education because he attended school in Guatemala. The Appellant described his physical and mental health as "excellent" but said that he was diagnosed HIV positive in 2005. The Appellant denied any criminal behavior in this case.

L.B. testified that at the time of the Appellant's sentencing hearing, K.S. and R.S. were twelve and ten years old, respectively. She said she had allowed the victims to play with the Appellant's daughter because she trusted the Appellant to take care of the victims. She said that the victims were doing "pretty good" since the trial and that they had "good days" and "bad days." She said K.S. "does not like men at all" and "recently [came] out that she is now gay." After the Appellant was arrested, children at K.S.'s school sent her messages on social media, asking how she could "sleep with a fifty-year-old man" and

telling her that "she should just kill herself." L.B. began homeschooling K.S., but K.S. returned to school less than one month before the sentencing hearing. L.B. said that R.S. was "doing a lot better" and that R.S. had recently spent the night with L.B.'s sister, which was "a big deal."

L.B. testified that as a result of the Appellant's actions, she no longer trusted the victims to spend the night with their friends. The victims wanted to stay home, and J.B. and L.B. "felt better" with the victims at home so that they did not have to "worry about it happening anymore." L.B. said that R.S. used to be very close to R.S.'s brother but that they did not "really talk" anymore. L.B. said she did not care if the Appellant spent time in prison because he was not going to affect her family again.

The State introduced the Appellant's presentence report into evidence. According to the report, the then fifty-eight-year-old Appellant was born and grew up in Guatemala. The Appellant stated in the report that he had three adult children in Guatemala and that he served in the Guatemalan military from 1979 to 1989. The Appellant also said that he moved to the United States in 2002 and that he lived in Texas, Florida, and New York before moving to Tennessee. However, Ms. Philyaw noted in the report that she could not verify the Appellant's military service or prior residences. The Appellant stated in the report that he was married to Holly, that they had two children together, and that he had one stepchild. The report showed that the Appellant had a 2016 conviction for rape of a child and convictions in 2008 and 2013 for violating the driver's license law.

At the conclusion of the hearing, the trial court stated that "it is undisputed that [the Appellant] is in the United States illegally."[4] The trial court found that the following enhancement factors applied to his sentences: (1), that "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; (7), that "[t]he offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement"; and (14), that the defendant abused a position of private trust. Tenn. Code Ann. § 40-35-114(1), (7), (14). The trial court gave "substantial" weight to enhancement factor (7) and "great" weight to enhancement factor (14). The trial court found that enhancement factor (7) necessitated more than the minimum sentence but that enhancement factor (14) deserved "such great weight" that it "gets us up to 40 years." The trial court explained,

I want to talk about testimony at trial. . . . [J.B.] said more than once how he trusted Mr. Abrego with these children. He is referred to as Alfredo and talked about their friendship and how he trusted him. Talked about how he was his friend. He usually picked up the girls and drove. Holly was

---

[4] We note that nothing in the appellate record supports the trial court's statement.

- 10 -

usually with him. They stayed in his daughter's room. . . . [J.B.] says he had been to Mr. Abrego's home many times. The girls always went together. And he may not be the biological father of these girls but he certainly is on an emotional level.

[L.B.] talked about that trust, too, trusting her girls with this family and with Mr. Abrego. She talked about that at trial. She talked about that today at sentencing.

. . . .

And I cannot tell you how important that violation of a position of private trust is to this Court with these little girls. And truly, his setup there, even asking for the girls to come, and his own daughter there as a magnet, as the Court sees it, significantly facilitated his ability to keep molesting these children.

The trial court did not apply any mitigating factors. The trial court stated that the Appellant's Strong R assessment was "out of whack with reality" and that his VASOR assessment was "totally inaccurate." The trial court said that the Appellant had exhibited a "[o]ne hundred percent failure to accept responsibility" and that the court had "no idea" whether the Appellant could be rehabilitated.

The trial court sentenced the Appellant as a Range II, multiple offender to thirty years for rape of a child, a Class A felony, and as a Range I, standard offender to ten years for each conviction of aggravated sexual battery, a Class B felony. See Tenn. Code Ann. § 40-35-112(a)(2), (b)(1). The trial court ordered that the Appellant serve the ten-year sentence for the aggravated sexual battery of K.S. concurrently with the thirty-year sentence for rape of a child but that he serve the ten-year sentence for the aggravated sexual battery of R.S. consecutive to the thirty-year sentence for a total effective sentence of forty-years. The trial court noted that the Appellant was required to serve one hundred percent of the sentences. See Tenn. Code Ann. § 40-35-501(i)(2)(H), (I). The trial court ordered that the Appellant serve the effective forty-year sentence consecutive to his previous thirty-year sentence for rape of a child.

This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing). In determining a defendant's sentence, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report;

- 11 -

(3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the defendant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. Moreover, consecutive sentencing is "guided by the general sentencing principles providing that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed.'" State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002) (citing Tenn. Code Ann. §§ 40-35-102(1), -103(2)). The burden is on the Appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

Initially, we note that the Appellant contends that we should review his sentences de novo because the trial court failed to state its findings adequately regarding the

aggravating factors that warranted consecutive sentencing. We disagree with the Appellant. Before announcing the Appellant's sentences, the trial court stated that it had considered the evidence presented at trial and sentencing, the presentence report, the principles of sentencing, the nature and characteristics of the criminal conduct, the enhancement but no mitigating factors, statistical information provided by the Administrative Office of the Courts (AOC) as to sentencing for similar offenses in Tennessee, and the Appellant's potential for rehabilitation or treatment. Accordingly, we will review the Appellant's sentences under an abuse of discretion standard with a presumption of reasonableness.

Although the Appellant did not raise any issues regarding the trial court's application of enhancement factors, we note that the trial court misapplied enhancement factor (7), that the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement, to the Appellant's sentences for aggravated sexual battery. Our supreme court has held that sexual battery necessarily includes the intent to gratify a desire for pleasure or excitement. See State v. Kissinger, 922 S.W.2d 482, 489 (Tenn. 1996).

As to enhancement factor (14), that the defendant abused a position of private trust, our supreme court has explained:

> [A]pplication of the factor requires a finding, first, that [the] defendant occupied a position of trust, either public or private. The position of parent, step-parent, babysitter, teacher, coach are but a few obvious examples. The determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship. Thus, the court should look to see whether the offender formally or informally stood in a relationship to the victim that promoted confidence, reliability, or faith.

Id. at 488 (emphasis added). Here, the trial court found that the Appellant was in a position of private trust with the victims' parents and that he abused that position of private trust. Although the trial court made no findings relative to the Appellant's being in a position of private trust with the victims, the record demonstrates that the victims were friends with the Appellant's children and that they regularly visited and had overnight stays with his children. Therefore, the Appellant occupied a position of private trust with the victims, and enhancement factor (14) was applicable.

Although the trial court misapplied enhancement factor (7), our supreme court has explained that a trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed. . . . So long as there are other reasons consistent with

- 13 -

the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Bise, 380 S.W.3d at 706. In this case, enhancement factors (1), (7), and (14) were applicable to the Appellant's sentence for rape of a child, and the trial court imposed a sentence of thirty years, just five years above the minimum punishment in the range. See Tenn. Code Ann. § 40-35-112(b)(1). Enhancement factors (1) and (14) were applicable to the Appellant's sentences for aggravated sexual battery, and the trial court imposed sentences of ten years, just two years above the minimum punishment in the range. See Tenn. Code Ann. § 40-35-112(a)(2). We conclude that the trial court did not abuse its discretion by imposing thirty- and ten-year sentences.

The Appellant claims that the trial court erred by ordering that he serve one of the ten-year sentences consecutive to the thirty-year sentence because there were insufficient "aggravating circumstances" to warrant consecutive sentencing. Specifically, he claims that the nature of the relationship was not particularly aggravated because he was just a parent of the victims' friend; that the time span of the undetected sexual activity was not aggravated because it was only six months; and that the nature and scope of the sexual acts was not aggravated beyond the facts in a typical child sexual abuse case. The State argues that the nature of the Appellant's relationship with the victims was aggravated because, as the trial court found, the Appellant used his relationship with the victims' parents to gain access to the victims and used his own daughter to lure them to his home. The State also argues that while the time span of the undetected sexual activity may have occurred over a period of months, the abuse went undetected for about one year because K.S. was afraid to reveal it. Finally, the State argues that the nature and scope of the sexual acts was aggravated because the trial court found that they had "significant repercussions" on the victims.

The trial court imposed consecutive sentencing pursuant to Tennessee Code Annotated section 40-35-115(b)(5), which provides,

> The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims.

As to the relationship between the defendant and victims, the trial court's comments during the hearing demonstrate that the court was greatly troubled that the Appellant used his friendship with J.B., used the trust he gained with J.B. and L.B., and used his own daughter to gain access to the victims. As to the time span of the undetected sexual activity,

the indictment alleged that the crimes occurred between April 1 and September 30, 2015. Although the victims could not give specific dates for the offenses, their testimony and that of their parents indicated that the victims made numerous visits, including overnight stays, to the Petitioner's home during that six-month period. As to the nature and scope of the sexual acts, the victims testified in detail about the abuse, and "[t]he statute does not require the State to present new evidence at the sentencing hearing regarding the nature and scope of the sexual acts nor does it require the trial court to provide a summary of the facts established at trial." State v. Doane, 393 S.W.3d 721, 738 (Tenn. Crim. App. 2011). We note, though, that the Appellant's abuse of K.S. progressed from groping her over her clothes to penetrating her vagina and that his abuse of R.S. occurred in the presence of his own children.

Finally, in addressing the residual, physical, and mental damage to the victims, the trial court stated as follows:

> [L.B.] has talked about the damage to the children. Significant, significant repercussions as to [K.S.]. I understand she has some other issues but this is major to her and her relationship with other people, kids at school, her sexual tendency, her declaration now of not trusting men, not liking men.
>
> [R.S.] now being able, maybe, to stay overnight with at least a kin folk, somebody that is near and dear. [L.B.'s] sister.

The Appellant does not contest that the residual, physical, and mental damage to the victims was an aggravating circumstance in this case. "[N]ot all of the aggravating circumstances listed in section 40-35-115(b)(5) 'must be present to support the imposition of consecutive sentencing.'" State v. Doane, 393 S.W.3d 721, 738 (Tenn. Crim. App. 2011) (quoting State v. James M. Powers, No. E2001-02363-CCA-R3-CD, 2002 WL 31387308, at *5 n.4 (Tenn. Crim. App. at Knoxville, Oct. 23, 2002)). Accordingly, we cannot say that the trial court abused its discretion in determining that the aggravating circumstances warranted consecutive sentencing.

The Appellant also claims that his effective forty-year sentence, which the trial court ordered that he serve consecutive to his previous thirty-year sentence, was not justly deserved in relation to the offenses, equates to a sentence of life without parole, and was "unjustly disparate" from other offenders convicted of the same offenses. However, the trial court noted that the Appellant had been convicted of sexual offenses involving three children and found that the public needed to be protected from him. Moreover, the statistical information on the AOC website reflects that while the median sentence for both standard offenders and all offenders convicted of rape of a child was 300 months in 2017 to 2018, the mean sentence for those two groups was 297.74 and 354.42 months,

respectively. <u>See</u> <u>http://www.tncourts.gov/sites/default/files/docs/tdoc_fall2018_stats.pdf</u>. The Appellant's 360-month sentence for rape of a child is less than six months above the mean sentence for all offenders convicted of the offense. Moreover, the Appellant now has two convictions of rape of a child and two convictions of aggravated sexual battery. In our view, the six-month disparity is not excessive, and we conclude that the Appellant has not overcome the presumption of reasonableness afforded to the trial court's consecutive sentencing decision. Nevertheless, we must remand the case to the trial court for the correction of the judgment of conviction in count two, rape of a child, to reflect that the trial court sentenced the Appellant as a Range II offender, not a Range I offender.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the Appellant's convictions and effective forty-year sentence but remand the case to the trial court for correction of the judgment for count two to reflect that the Appellant was sentenced as a Range II offender.


_____

NORMA MCGEE OGLE, JUDGE