IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 23, 2021 Session

**STATE OF TENNESSEE v. DERRICK HIMES**

**Appeal from the Circuit Court for Rutherford County**
No. F-75485          Royce Taylor, Judge

_____

**No. M2020-00407-CCA-R3-CD**

_____

A Rutherford County Circuit Court Jury convicted the Appellant, Derrick Himes, of three counts of rape of a child and three counts of aggravated sexual battery. The trial court imposed a sentence of twenty-five years for each rape of a child conviction and eight years for each aggravated sexual battery conviction. The trial court imposed concurrent sentences of twenty-five years for each rape of a child conviction, concurrent sentences of eight years for each aggravated sexual battery conviction, and ordered that the twenty-five-year sentence and the eight-year sentence be served consecutively for a total effective sentence of thirty-three years. On appeal, the Appellant contends that (1) the trial court erred in denying the Appellant's motion for a judgment of acquittal and motion for new trial because the evidence was insufficient to sustain the convictions, (2) the trial court abused its discretion by allowing the prosecutor to elicit irrelevant and prejudicial testimony from the State's witnesses, and (3) the trial court erred in imposing consecutive sentencing. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Patrick T. McNally, Nashville, Tennessee, for the Appellant, Derrick Himes.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; Jennings Hutson Jones, District Attorney General; and Hugh T. Ammerman, III, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

The Appellant was charged with three counts of rape of a child, three counts of aggravated sexual battery, and one count of solicitation of sexual exploitation of a minor. The charges were based upon incidents that occurred between the Appellant and the minor victim, who was the daughter of the Appellant's girlfriend, between September 2007 and May 2008.

At trial, the victim testified that she was born on December 3, 1995. She had attended high school through the tenth grade. The victim said that she was "[s]cared" to be in court.

The victim said that when she was growing up, she had three main people in her life: her grandmother, her mother, and her younger sister. Since the offenses, the victim's mother had not played "much" of a role in the victim's life, and her mother did not remember anything about the time during the incidents because she had been "too high."

The victim said that when she was eleven or twelve years old, she, her mother, and her sister moved into an apartment in the Green Meadows Apartments in Murfreesboro, Tennessee. They lived in the apartment for less than one year. The apartment was located on the "[s]econd story" on the back side of the apartment complex. It had two bedrooms, two bathrooms, a laundry room, and a kitchen. The victim recalled that "[a]ll kinds of people" stayed at the apartment and that she and her sister "slept in any room that [they] could find to sleep in" when the apartment was crowded. The victim said that when she slept in her mother's room, she sometimes slept on the bed and other times she slept on the floor. The victim stated that her sister often left the apartment and went to a friend's house.

The victim said that while they were living at the apartment, her mother lost her job at a Chick-fil-A restaurant. The victim's mother was often away from the apartment while she was unemployed. The victim did not know where her mother would go, and she did not realize her mother was using drugs. The victim said that her mother would acknowledge that she had been using drugs at the time but would deny being a "junkie" and would describe her drug use as "tolerable."

The victim recalled that the Appellant, whom she knew as "Tank," began staying with them one or two months after they moved into the apartment. The Appellant left the apartment and moved to Louisiana a few weeks before the victim and her family moved out of the apartment.

The victim said the Appellant did not work while he lived with her family. A couple of weeks after the Appellant moved in, the victim began referring to him as "dad." The Appellant "seemed okay with" it, and her mother agreed because she thought the Appellant "was going to be a father figure towards [the victim] and [her] sister." The Appellant paid

attention to the victim and her sister, took them out to eat, and bought them things such as "[f]ood, lingerie, [and] clothes."

The victim said that the Appellant began doing "inappropriate things" to her; however, she could not remember when they began and could not recall the order in which the incidents occurred. The victim remembered that on one occasion, the Appellant entered the laundry room while she was putting clothes into the washing machine. He came up behind her, pressed against her, and rubbed his hand up her thigh. The victim pushed the Appellant, stepped away from him, and left the laundry room.

The victim recalled an occasion when she was in the shower, and the Appellant removed his clothes and stepped into the shower behind her. The Appellant touched her breasts with his hands, slid his hand between her legs, touched her genitals, and inserted his finger inside her vagina. The victim pushed the Appellant's hand away and got out of the shower. She retreated to her bedroom when she was unable to find her mother.

The victim remembered another occasion when the Christmas tree was still up and she was sitting with the Appellant on the couch in the living room. The victim told the Appellant she was "happy that [she] had a dad," and he responded that "every girl deserves a dad." The Appellant rubbed her legs, including the inside of her leg; her buttocks, and "all over [her] body" on top of her clothes while they were watching television. The Appellant told her that she was "special." The victim said that she started "accepting" the abuse because she was "tired of fighting with people" and "because [she] felt like the more that [she] tried to stop it, it was just going to happen again."

The victim testified that on one occasion, she and her sister had to sleep on the floor of her mother's bedroom because so many people were in the apartment. The victim slept on the floor on the Appellant's side of the bed, and her sister slept on the floor on their mother's side of the bed. The victim said the Appellant started "rubbing" her. She explained that "his hand was underneath the cover but out of it where he was able to reach me." The Appellant rubbed the victim's shoulder, grabbed her breasts, and touched her side. He then rolled over to face her mother and fell asleep.

The victim recalled another incident which occurred when she was in her bedroom and her sister was gone. The victim was in bed and wearing a t-shirt and underwear. The Appellant came into her bedroom and got into bed with her. At some point during the incident, her underwear came off. The Appellant kissed her, got on top of her, and inserted his penis into her vagina. The Appellant moved his penis in and out of her vagina a few times. During the penetration, the Appellant told the victim "it was better me than my sister." The victim cried for her mother, but her mother did not come. The victim said that she started bleeding and did not know what to do. The Appellant stopped, and the victim

went to the bathroom. The victim was unable to find her mother and returned to her bedroom.

After the Appellant penetrated her vagina with his penis in her bedroom, she tried to tell her mother what the Appellant had done. The victim said that her mother got angry, called her a "liar," accused her of "trying to steal her man," and tried to "fight" her. Someone got between them, and the victim ran away, fearing her mother would beat her. The victim said that she was surprised by her mother's anger.

The victim said that on one occasion, the Appellant took her to a McDonald's restaurant to get lunch for her family. On the way to and from the restaurant, the Appellant held her hand. On the return trip, he told her that he loved her. When they returned to the apartment, the Appellant grabbed a white bag from his car and took the bag into the apartment. Inside the bag was a red and black sweater, which he gave to the victim's sister. Thereafter, the victim's mother and sister left the apartment. When the victim and the Appellant were alone in the house, the Appellant gave the victim some lingerie, which she described as "adult underwear" and not "the usual underwear that [she] wore." The victim stated that she "didn't wear lingerie at that age. I barely wore even bras. I just had sports bras. And these were like bras my mom would wear, clothes my mom would wear."

The victim said that the Appellant asked her if she wanted to try on the lingerie. She agreed, and after putting on the lingerie, she sat next to the Appellant on the couch. The Appellant put a cupcake into his mouth, and the victim took part of the cupcake from the Appellant's mouth with her mouth. Thereafter, the Appellant removed his penis from his pants, he moved the victim's head from his chest to his penis, and the victim performed oral sex on him. When the victim tried to pull away, he pushed her head down. She said that she "tasted something salty, so I spit it back out."

The victim said that on another occasion on the couch, the Appellant touched her under her pajama bottoms. He touched her legs, slid his hands underneath her pants, and touched her "private parts" on the "outside."

The victim said that later, she had tried to commit suicide by swallowing pills she had taken from her grandparents' medicine cabinet. The pills caused her to hallucinate, and her heart stopped. The doctors revived her, and she was hospitalized for several days. After the suicide attempt, the victim told her sister what the Appellant had done to her. Thereafter, she went to "Rolling Hills" where she "supposedly" told a nurse that the Appellant had sexually abused her. Subsequently, the victim spoke with Detective Knox about the abuse. She also spoke with a woman from the district attorney's office.

The victim said that after the Appellant left their apartment and went to Louisiana, she called him once and asked if he planned to return. The Appellant said he was not going

- 4 -

to return, and she was sad. The victim explained that she contacted the Appellant "[b]ecause [she] thought that's what you did when you had a dad." The victim said that she "wasn't happy" prosecuting the Appellant, explaining, "I was okay with doing it. But I was scared to do it at the same time."

The victim acknowledged that in November and December 2014, she and her boyfriend, Christopher Daniel Handley, broke into people's homes and stole things. Handley sold the stolen items to support his drug addiction. The victim said that she drove to and from the offenses, and, on one occasion, she helped Handley "rob" her grandmother's home. The victim had been charged with offenses in Limestone County and Morgan County, Alabama; and in Rutherford County, Williamson County, Wilson County, Maury County, Marshall County, and Sumner County, Tennessee. She also had been charged in Kentucky but that charge was dismissed. The victim ultimately pled guilty and was sentenced to ten years in Alabama and nine years in Tennessee. She said that she had spent four years in confinement and that while she was in jail, her younger sister was murdered in Cannon County on January 15, 2017. The victim was denied permission to attend her sister's funeral. The victim said that she worked at a Chick-fil-A restaurant before and after her incarceration. She said that she was not proud of her criminal behavior and that she would have done things differently if she could.

On cross-examination, the victim said that the abuse occurred between September 1, 2007, and May 31, 2008. The victim did not recall the specific dates on which the offenses occurred, but she knew she was twelve years old when the offenses occurred. The victim acknowledged that she first made allegations against the Appellant in 2012, approximately four or five years after the offenses. The victim was hospitalized because she had taken a large number of pills when she made the allegations. The victim could not recall what happened in the hospital "because [she] was still heavily medicated." The victim said that, although she had no specific recollection of the conversation, she believed she told the people in the hospital that her mother was a drug addict and a prostitute.

The victim said that she loved her mother and wanted to support her. However, because the victim was a felon, she risked being sent back to prison if she associated with her mother. The victim said that her mother's behavior towards her when she was a child had hurt her and caused her anxiety and pain. At the time, the victim did not realize her mother was on drugs, but she knew that her mother "wasn't right."

The victim said that Detective Knox told her that it was important to tell everything about the offenses. The victim acknowledged that her recorded statement reflected that she told Detective Knox that she had lived with her mother in the Green Meadows Apartments but that she did not recall the specific dates when they resided there. Detective Knox then advised the victim "that she had determined that [the victim] lived there between September the 19th of 2007 and May the 31st of 2008." The victim told Detective Knox

that the Appellant came to stay with them "near the beginning" of their stay in the apartment. The victim thought she told Detective Knox about the lingerie and about eating cupcakes from the Appellant's mouth. She agreed, however, that if the transcript of her interview reflected that she did not tell Detective Knox about the lingerie or cupcake, then it was "fair to say that [she] did not say those things."

The victim said that she could not recall specifically what she told Detective Knox. The victim acknowledged that she knew her cooperation with Detective Knox was important and that she should tell Detective Knox everything she knew "[a]t that time." The victim asserted, "I do know what I remember. And I know that for certain. . . . The things that I remember, I know for certain. Word for word, no, I don't remember. But I know what happened to me." The victim agreed that her memory had "changed from time to time."

The victim agreed that when she pled guilty in Limestone County, Alabama, the court found her to be a "youthful offender." The victim further agreed that regarding her pending charges in Morgan County, Alabama, she had petitioned the court to declare her a "youthful offender," which she thought would render her record sealed. The victim said she had told her attorney on the Morgan County cases that she was a victim of the Appellant's sexual abuse.

On redirect examination, the victim said that she had never known her biological father. The victim said that she had not fought any of the charges against her, that she had written "statements against" herself, and that she had not tried to take the cases to trial. The victim thought that being "in an abusive relationship with [her] charge partner," who was significantly older and a "career criminal," had been the most beneficial factor in the dismissal or reduction of some of her charges. The victim said that she had no criminal history before her relationship with her "charge partner." The victim agreed that she was "trying to be as honest and tell the truth to the best of [her] ability in this trial."

Shaina Champion-Richardson testified that from 2010 to 2017, she worked as a child protective services investigator with the Department of Children's Services (DCS) and that she was assigned to the victim's case. Champion-Richardson recalled that after the victim attempted suicide, the victim told "Mobile Crisis" that she had been the victim of sexual abuse.

On cross-examination, Champion-Richardson said that she first interviewed the victim in May 2012. She also was present on one occasion when the victim was interviewed by Detective Knox. Champion-Richardson acknowledged that she had interviewed the victim's mother and grandmother, who denied any knowledge of the sexual abuse.

Tannas Knox testified that she worked in the special victims' unit of the criminal investigation division of the Murfreesboro Police Department and that she was the detective assigned to investigate the victim's allegations. Detective Knox said that in May 2012, she received a referral from DCS regarding the victim's delayed disclosure of sexual abuse that occurred sometime in 2007 to 2008. Detective Knox confirmed that the victim lived at the Green Meadows Apartments between September 19, 2007, and May 15, 2008.

As part of the investigation, Detective Knox interviewed potential witnesses. During her interview with the Appellant, Detective Knox made several references to the victim's being thirteen years old at the time of the offenses "as a tactic" to get the Appellant to talk more. Detective Knox acknowledged, however, that the victim was eleven years old at the time of the offenses.

The State played a recording of the Appellant's interview for the jury. During the interview, the Appellant said that he had "shacked up" at the victim's mother's apartment for approximately two months and that he and the victim's mother had a "sexual relationship." The apartment had two bedrooms: the Appellant slept in the victim's mother's bedroom, and the two children usually slept on the floor of the bedroom. The Appellant thought that the victim was thirteen years old and that her younger sister was nine years old at that time. The victim's mother had "a crack habit," and she left her two children with the Appellant "a lot." Both children were "clingy" and started calling the Appellant "daddy" a day or two after he moved in the apartment.

During the interview, the Appellant agreed he felt that the victim "liked [him] or was coming onto [him]." He acknowledged that the victim showed him some "Fredrick's of Hollywood" panties she was wearing and told him that she got them from a neighbor. The Appellant said that the victim told him she had "decided she wanted to have a baby" and that he told her to stay in school. The Appellant regretted not telling the victim's mother that the victim was sexually active. The Appellant said that while he and the victim were sitting on a couch in the living room, she put her hand on his leg. When asked if he thought the touch was "sexual in nature, or was it like just a 13-year-old," the Appellant responded, "Could have been both."

During the interview, the Appellant said the victim's mother was employed at a restaurant while he lived at her apartment, but he was unemployed. The Appellant said that "[n]othing" happened between the victim and him and denied having sex with her. The Appellant agreed that the victim and her sister were "good kids" and that they were "truthful."

During the interview, Detective Knox told the Appellant that the victim said she had performed oral sex on the Appellant. The Appellant responded, "Wow. . . . I don't remember that. You know, I must have been asleep or something, you know." The

Appellant agreed that the victim was "attractive" and that he said she was "built, you know, like a woman."

Detective Knox said that she interviewed the victim twice and also interviewed the victim's mother. The first interview with the victim occurred on May 31, 2012. However, due to a "malfunction," the interview was not recorded. Detective Knox asked the victim for a second interview, which occurred and was recorded on June 11, 2012.

On cross-examination, Detective Knox agreed that she received the victim's complaint about the Appellant on May 31, 2012. Detective Knox did not take the victim to Child Advocacy Center (CAC) for a forensic interview. Detective Knox acknowledged that she did not have the victim examined medically, explaining that because of the approximate five-year delay in disclosure, no evidence likely would be found.

Detective Knox said that she and Detective Kelvin Jones interviewed the Appellant on August 12, 2013. During the interview, the Appellant repeatedly denied having sex with the victim. Detective Knox agreed that her case notes reflected the victim had mentioned four incidents during the interview. Detective Knox further agreed that her case notes did not reflect the victim's mentioning that she removed an item from the Appellant's mouth or used her mouth to take an item from his mouth or a sex act following a trip to McDonald's. Detective Knox stated that she was also a forensic interviewer and that when interviewing a child, it was not uncommon for the child to fail to disclose all the events.

At the close of the State's case-in-chief but before the Appellant chose whether he would testify, the State made the following election of offenses:

> Count 1, rape of a child, refers to an incident wherein the [Appellant], who was seated on the living room couch, exposed his genitalia and instructed the victim to get on her knees on the floor before grabbing the victim by the hair and putting his genitalia in her mouth.
>
> Count 2, rape of a child, refers to an incident of digital-genital penetration wherein the [Appellant] entered the bathroom where the victim was taking a shower, and put his finger inside of the victim's genitalia.
>
> Count 3, rape of a child, refers to an incident of genital-genital penetration in the victim's bedroom wherein the victim yelled out for her mother.

Count 4, aggravated sexual battery, refers to an incident wherein the [Appellant] grabbed the victim's breast on a night when she was sleeping in her mom's room situated on the [Appellant's] side of the bed.

Count 5, aggravated sexual battery, refers to an incident on the same occasion described above under Count 2 wherein the [Appellant] touched the victim's breasts with his hand while the victim was in the shower.

Count 6, aggravated sexual battery, refers to an incident wherein the [Appellant] touched the outside of the victim's genitalia underneath the clothes while he and the victim were seated on the couch.

Regarding count 7, solicitation of sexual exploitation of a minor, the State voluntarily dismissed the charge.

The Appellant elected not to testify or put on proof, and the jury found the Appellant guilty as charged. The trial court imposed concurrent sentences of twenty-five years for each rape of a child conviction, concurrent sentences of eight years for each aggravated sexual battery conviction, and ordered that the twenty-five-year sentence and the eight-year sentence be served consecutively for a total effective sentence of thirty-three years.

On appeal, the Appellant contends that (1) the trial court erred in denying his motion for a judgment of acquittal because the evidence was insufficient to sustain the convictions, (2) the trial court abused its discretion by allowing the prosecutor to elicit irrelevant and prejudicial testimony from the State's witnesses, and (3) the trial court erred in imposing consecutive sentencing.

## II. Analysis

### A. Sufficiency of the Evidence

The Appellant challenges the trial court's denial of his motion for a judgment of acquittal, which was made at the conclusion of the State's proof. "The standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction . . . ." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). Therefore, we will address the Appellant's complaint as a challenge to the sufficiency of the evidence.

On appeal, a jury conviction removes the presumption of the Appellant's innocence and replaces it with one of guilt, so that the Appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The Appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Rape of a child is the unlawful sexual penetration of a victim by a defendant if the victim is more than three years old but less than thirteen years old. Tenn. Code Ann. § 39-13-522(a). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code. Ann. § 39-13-501(7). Aggravated sexual battery is "unlawful sexual contact with a victim by the defendant," and the victim is less than thirteen years old. Tenn. Code Ann. § 39-13-505(a)(4). "Sexual contact" is defined as "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6).

The Appellant's complaints about the sufficiency of the evidence sustaining his convictions concern the credibility of the victim's testimony. The Appellant asserts that the only direct evidence implicating him was the victim's testimony and that her testimony was inconsistent and was not credible. The Appellant contends the victim had problems with her memory due to her suicide attempt and that some details of the incidents varied between her trial testimony and her statement to Detective Knox. The Appellant also

complains about the time that elapsed between the offenses and the time the victim reported the abuse, and the victim's failure to seek help from her mother.

Our supreme court has held that "[t]he jury, as the trier of fact, is empowered to assess the credibility of the witnesses, to address the weight to be given their testimony, and to reconcile any conflicts in the proof." State v. Sexton, 368 S.W.3d 371, 398 (Tenn. 2012); see State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). Our courts have repeatedly held that the testimony of a rape victim is sufficient, standing alone, to sustain a conviction. See State v. Elkins, 102 S.W.3d 578, 582-83 (Tenn. 2003); State v. Wyrick, 62 S.W.3d 751, 767 (Tenn. Crim. App. 2001). In the instant case, the victim testified that she told her mother about the Appellant's abuse but that her mother, who was a drug addict, accused her of lying. The victim did not reveal the abuse again until many years later, after she attempted suicide. The victim explained that any inconsistencies in her testimony could be attributed to the length of time that elapsed between the offenses and the allegations and because she had tried to forget what happened to her. See State v. Finch, 465 S.W.3d 584, 604 (Tenn. Crim. App. 2013), overruled on other grounds by State v. Menke, 590 S.W.3d 455 (Tenn. 2019). Moreover, Detective Knox testified that it was not uncommon for a victim of sexual abuse to omit details during an interview. The jury heard the proof and clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). The victim gave detailed testimony about each instance of rape of a child and aggravated sexual battery. We conclude that the proof was sufficient to sustain the Appellant's convictions.

### B. Improper Questioning of State's Witnesses

The Appellant contends that the State asked improper questions which were irrelevant and were intended to "inflame the sympathies, passions, or prejudices of the jury." The Appellant specifically contends that the State asked improper questions of the victim regarding her mother's role in her life as a result of her mother's drug use and incarceration, the murder of the victim's sister, and the victim's inability to attend her sister's funeral due to her incarceration.

The Appellant also complains about the State's asking the victim on redirect examination if the victim had tried to be honest during the interview with Detective Knox. The Appellant further complains that on redirect examination, after Detective Knox testified she interviewed the victim on two occasions, the State asked, "Did you – was her account consistent between those two [interviews]?" Detective Knox replied, "Yes, her accounts were consistent." The Appellant argues that the detective's answers to the questions were "improper comment[s]" on the evidence.

- 11 -

Initially, we note that the Appellant objected to only two of the State's questions. First, when the State asked on redirect examination if the victim had tried to be honest during the interview with Detective Knox, defense counsel objected "to bolstering," but the objection was overruled by the trial court. On redirect examination, after Detective Knox testified she interviewed the victim on two occasions, the State asked, "Did you – was her account consistent between those two [interviews]?" Defense counsel objected on the basis that the answer "calls for a conclusion." The trial court overruled the objection, stating, "I think she can answer that. Go ahead." Detective Knox responded, "Yes, her accounts were consistent."

On appeal, the Appellant maintains that the detective's "answer was an improper comment on the evidence." The State contends that the Appellant cross-examined the victim "about her credibility and motive to lie" and that in response, on redirect examination, the State was allowed to ask the victim if she tried to be honest during her interviews with Detective Knox. The State also maintains that after the Appellant attacked the victim's credibility, "there was nothing impermissible in the State prompting the victim to defend her own credibility by explaining her prior inconsistent statement and by affirming that she was testifying truthfully." The State contends that the purpose of asking Detective Knox whether the victim's two interviews were consistent "was to inform the jury that the substance of both interviews was the same, given that there was only a recording of the second interview." The State notes that defense counsel had used the victim's recorded interview to impeach the victim on cross-examination and had asked specific questions about both interviews, thereby raising the subject. The State asserts that if any error existed in allowing the question to be asked, the error was clearly harmless. We agree with the State. The record reveals that during cross-examination of the victim, defense counsel asked whether the victim knew that it was important to tell Detective Knox everything during the interview and that defense counsel asked additional questions challenging the victim's credibility during the interviews. Accordingly, we conclude that the State's questions were clearly a response to defense counsel's challenge to the victim's credibility. Thus, the trial court did not err by permitting the questions.

On appeal, the Appellant further challenges Detective Knox's response as improper lay opinion under Tennessee Rule of Evidence 701. However, the Appellant did not challenge Detective Knox's testimony on this basis in the lower court. Generally, a party is bound by the evidentiary theory argued to the trial court and may not change or add theories on appeal. See State v. Banes, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993). Therefore, a defendant may not object to the introduction of evidence on one ground, abandon this ground, and assert a new basis or ground for the objection in this [c]ourt. State v. Aucoin, 756 S.W.2d 705, 715 (Tenn. Crim. App. 1988). This issue is waived.

On appeal, the Appellant acknowledges that he did not contemporaneously object to the remaining questions but contends that he is entitled to plain error relief. The State

- 12 -

maintains that by failing to raise contemporaneous objections, the Appellant has waived the issues and that the Appellant is not entitled to plain error relief. We agree with the State.

Tennessee Rule of Appellate Procedure 36(b) provides that "[w]hen necessary to do substantial justice, [this] court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." See also Tenn. R. Evid. 103(d); State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000); State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). We may only consider an issue as plain error when all five of the following factors are met:

> a) the record must clearly establish what occurred in the trial court; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is "necessary to do substantial justice."

Adkisson, 899 S.W.2d at 641-42 (footnotes omitted); see also Smith, 24 S.W.3d at 283 (adopting the Adkisson test for determining plain error). Furthermore, the "plain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (internal quotation marks omitted) (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

Generally, "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this [c]ourt will not interfere in the absence of abuse appearing on the face of the record." State v. Pylant, 263 S.W.3d 854, 870 (Tenn. 2008). A trial court abuses its discretion when it "applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Id.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. However, even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Questions regarding the admissibility and relevancy of evidence lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the

face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)).

The Appellant contends that the questions about the death of the victim's sister and her mother's drug addiction were unfairly prejudicial because they were intended to "inflame the sympathies, passions, or prejudices of the jury." The Appellant also contends that the questions were not relevant and that, therefore, they were improper. The State maintains that the questions about the victim's sister and mother were relevant to explain why the victim was alone with the Appellant and why the victim's sister and mother were unable to corroborate her testimony. The State further maintains that the victim needed to explain "why her prior incarceration was not something that she took lightly." The State asserts that any error by allowing the questioning did not render the Appellant's trial fundamentally unfair. The State further alleges that the Appellant's failure to object may have been a tactical decision to avoid the risk of "offending the jury by appearing to thwart the victim's attempt to tell her side of the story."

The State's questions regarding the victim's mother and sister largely dealt with their inability to verify the victim's version of events, which was relevant to the issues at trial. The victim's testimony revealed that because of her sister's death and her mother's drug use, they were unable to testify about the events. We acknowledge that the State's questions regarding the manner of the sister's death, the victim's inability to attend her sister's funeral, and the victim's disappointment in being unable to say goodbye to her sister were not relevant and, therefore, should not have been addressed. However, we conclude that the Appellant is not entitled to plain error relief because consideration of the error is not necessary to do substantial justice.

C. Sentencing

As his final issue, the Appellant challenges the trial court's imposition of consecutive sentencing. At the sentencing hearing, the State submitted the Appellant's presentence report as an exhibit. The State said that it would rely upon the proof adduced at trial.

In an allocution, the Appellant claimed that the victim was "cunning," that she "devoted herself to deceit," and that she "poured out her heart to lies." The Appellant maintained that he was innocent of the charges against him. The Appellant said that he had wanted to subpoena the victim's mother and have her watch the video of the victim "making those false allegations." The Appellant said that he "assum[ed] that these things happened to [the victim], . . . because of her performance at the trial and the conviction of her testimony," that her assailant must live in Murfreesboro, that the victim must be afraid to confront the person, and that the Appellant "was the perfect face" to accuse because he

- 14 -

was living in California or Las Vegas. He maintained that the victim "had to play along" in order to "stay[] out of prison."

The trial court stated that it had reviewed the presentence report and the sentencing guidelines and had considered the nature of the conduct involved and the statistical information provided by the Administrative Office of the Courts. The trial court also examined "the factors of the case" and found that "the prior criminal offenses appear to be minor." The trial court imposed the minimum Range II sentence of twenty-five years for each of the three rape of a child convictions. The trial court likewise imposed the minimum eight-year sentence for each of the three aggravated sexual battery convictions.

In considering whether to impose consecutive sentences, the trial court noted that the case concerned multiple convictions of two or more statutory offenses involving sexual abuse of a minor. See Tenn. Code Ann. § 40-35-115(b)(5). Therefore, the trial court examined the aggravated circumstances stemming from the relationship between the Appellant and the victim and noted that the Appellant was the boyfriend of the victim's mother, that he was living with them at the time of the offenses, and that the victim called him "daddy." Regarding the timespan of the undetected sexual activity, the trial court observed, "This was not discovered until the child turned 16 and attempted suicide." The trial court also found that the victim had significant residual physical and mental damage.

The trial court ordered the twenty-five-year rape of a child sentences to be served concurrently with each other and the eight-year aggravated sexual battery sentences to be served concurrently with each other but consecutively to the sentences for rape of a child for a total effective sentence of thirty-three years.

This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In conducting its review, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Appellant in his own behalf; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the Appellant to demonstrate the impropriety of his sentences. See Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.

- 15 -

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

The trial court imposed consecutive sentencing pursuant to Tennessee Code Annotated section 40-35-115(b)(5), which provides:

> The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims.

On appeal, the Appellant contends that the trial court erroneously determined that consecutive sentencing should be applied under Tennessee Code Annotated section 40-35-

115(b)(5) after determining that the length of the undetected sexual activity should be determined by the span of time between the abuse and the discovery of the abuse instead of the span of time during which the abuse occurred. The Appellant complains that he resided in the residence with the victim "for only a few months" despite the trial court's statement that "[t]here was a time span with regard to the undetected sexual activity that's to be considered as part of the statute. This was not discovered until the child turned 16 and attempted suicide."

Although the victim was unable to recall when the offenses occurred, and thereby could not assert the time span during which the offenses occurred, this court previously has stated that "not all of the aggravating circumstances listed in section 40-35-115(b)(5) must be present to support the imposition of consecutive sentencing." State v. Doane, 393 S.W.3d 721, 738 (Tenn. Crim. App. 2011) (internal quotation marks and citation omitted). Additionally, this court explained that "consecutive sentences may still be appropriate under section 40-35-115(b)(5) even when one factor militates against them if the other aggravating circumstances have been established and carry sufficient weight." Id. We note that the trial court found that the Appellant was the victim's mother's boyfriend and that the abuse occurred during the months the Appellant lived with the victim's family. Undisputedly, the victim referred to the Appellant as "daddy" and viewed him as a "father figure." The Appellant had control of much of the victim's care, and he abused a position of private trust by molesting her while she was under his care. The trial court found that the victim had residual mental damage from the abuse. Indeed, the record reflects that the victim attempted suicide because of the abuse. We conclude that the trial court did not err by imposing consecutive sentencing. See State v. Ricky Dale Breeden, No. E2019-00983-CCA-R3-CD, 2020 WL 5638589, at *27 (Tenn. Crim. App. at Knoxville, Sept. 21, 2020), appeal denied (Tenn. Feb. 4, 2021); State v. Robert Allen Zaloba, No. M2011-00855-CCA-R3-CD, 2012 WL 6690027, at *26 (Tenn. Crim. App. at Nashville, Dec. 26, 2012).

## III.  Conclusion

Finding no reversible error, we affirm the judgments of the trial court.

NORMA MCGEE OGLE, JUDGE