IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 26, 2022 Session

## STATE OF TENNESSEE v. RANDALL LEE PRUITT

**Appeal from the Criminal Court for Monroe County**
**No. 19-198   Andrew Freiberg, Judge**

_____

### No. E2021-01118-CCA-R3-CD

_____

The Defendant, Randall Lee Pruitt, pleaded guilty in the Monroe County Criminal Court to three counts of rape, a Class A felony. *See* T.C.A. § 39-13-503 (2018). After a sentencing hearing, the trial court imposed nine and one-half years for each conviction and ordered consecutive service, for an effective twenty-eight-and-one-half-year sentence. On appeal, he contends that the court erred by ordering consecutive service. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JR., JJ., joined.

Steven B. Ward, Madisonville, Tennessee, for the appellant, Randall Lee Pruitt.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Richard D. Douglas, Assistant Attorney General; Stephen D. Crump, District Attorney General; and Shari Tayloe, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Defendant's convictions relate to his sexual abuse of his then-fourteen-year-old adopted daughter. In May 2019, the Defendant was indicted for three counts of rape of a child, but the State later obtained a superseding indictment, alleging three counts of rape. On June 21, 2019, the Defendant pleaded guilty to three counts of rape. Pursuant to the plea agreement, the trial court would determine the length of the sentences and whether to impose consecutive service.

At the guilty plea hearing, the State's recitation of the facts were as follows:

> On or about . . . December 26[th], 2018, and January 13th, 2019, Mr. Pruitt and his family had moved to Monroe County. A few days after moving to Monroe County, the abuse that Mr. Pruitt inflicted on his oldest adopted daughter began again; and that is, he would sneak into her bedroom; he would unlawfully penetrate her vaginally [with his penis] and then leave the room. That went on many times during that time period. The State would have elected three of those times, including one where his oldest adopted daughter would - well, she set up her cell phone, Your Honor, and video recorded Mr. Pruitt raping her. On the13[th] of January of 2019, was the last time that he raped her and then she ran away. During the course of the investigation of trying to find her was when all this abuse came to light.

> . . . .

> And they all would occur in her bedroom. He would - when every, when the household was asleep, he would go in there and then that's when he would rape her.

> . . . .

> There's also a video recording, Your Honor, where . . . the adoptive daughter had also had her cell phone and recorded a conversation between the two where he corroborates what was going on, not only in Monroe County but before that, talking about the relationship, asking her if she wanted him to quit and so on.

The prosecutor explained that the victim was age fourteen at the time of the offenses and that her mother's and the Defendant's parental rights had since been terminated.

At the August 27, 2021 sentencing hearing, the presentence report was received as an exhibit. The report reflects that the forty-four-year-old Defendant had previous convictions for two counts of facilitation of felony theft and misdemeanor making a false report. Certified copies of the convictions were likewise received as an exhibit. Although the report reflects that the Defendant had likewise been convicted of "domestic violence," the report was amended at the sentencing hearing to reflect that the Defendant completed judicial diversion and that the charge had been dismissed. The Defendant received probation for the facilitation of theft and false reporting convictions. While serving his sentence on probation, the Defendant tested positive for cocaine twice, was placed on "absconder status," and his probation was revoked. The Defendant was later returned to "determinate release" probation, which expired in 2006. The report reflects that the

Defendant had pending criminal charges in connection with the victim in Gwinnett County, Georgia, for rape, aggravated child molestation, and child molestation and incest, which were alleged to have occurred on June 1, 2016. The Defendant stated during his presentence investigation interview that the victim obtained an order of protection, which remained effective at the time of sentencing.

The presentence report reflects that the Defendant had completed high school and reported good physical and mental health. He took medications for high blood pressure, diabetes, and cholesterol. He denied being an alcoholic and admitted to using cocaine between 2003 and 2005. The Defendant had been married twice, which included a twelve-year marriage to the victim's mother. The Defendant reported his divorce from the victim's mother was related to the present case. The Defendant reported working as a truck driver from 2017 to the time of the presentence investigation.

The Defendant told the presentence investigator that he had been drinking too much and allowed himself to "make very bad judgment decisions many times." He stated that he had prayed for forgiveness and acknowledged that his "selfishness caused a wripple [sic] effect of damage" for his children, his former wife, his parents, and himself. The Defendant regretted his conduct and acknowledged the victim would have "difficulty throughout life."

The presentence report reflects that the Defendant received a low Strong-R Assessment score.

The sixteen-year-old victim testified that she met the Defendant, her adopted father, at age two and one-half in Jefferson County, Tennessee, and that she and her three siblings lived with the Defendant and her mother in Georgia and later in Tennessee. The victim said that in December 2018, everyone moved into the Monroe County home and that they were "back and forth" moving from Georgia to Tennessee during this time. The victim lived at the Tennessee home for about three weeks before she ran away. She said that she ran away because the Defendant "molested" her and that the abuse started not long after the Defendant adopted her at the age of two and one-half or three.

The victim testified that initially, the Defendant touched her breasts and vagina and that he penetrated her vagina with his tongue. She said that around ages two and three, he digitally penetrated her vagina. She said that around age thirteen and her first menstrual cycle, the Defendant began penetrating her vagina with his penis. She said the Defendant "groomed" her with the initial touching. The victim stated that she video recorded one incident of sexual abuse before she ran away from home. The recording was received as an exhibit and reviewed by the trial court. The victim stated that between 2006 and 2019, the incidents were frequent and that the Defendant penetrated her vagina with his penis "several times a day."

When asked how the abuse affected her, the victim testified, "God, I have been so angry . . . hurt and confused . . . and there are just days where I am nothing but furious and just – I can't . . ." When asked about her physical health, she said that she ate less than normal "because there [were] just some days that are harder than others." She said that she did not sleep adequately and that at times she hated everything about herself. She said the abuse began at such an early age that she had not realized what was happening was wrong until age eight. She turned fourteen years old in September 2018, and she ran away in January 2019 because she was scared of the Defendant. She said that her "escape" was planned for months with a "strange guy" she did not know.

The victim testified that in 2018 or 2019, when the family lived in Georgia, she told her mother about the abuse but that her mother did not believe her. When asked if the victim's siblings knew about the abuse, the victim stated that her sister was also being "molested" by the Defendant. The victim said that the Defendant "would do it" to both of them "at the same time for a while" and that they discussed "it a little bit." When the trial court asked if the victim saw the Defendant "touch" the victim's sister, the victim responded, "Yes."

On cross-examination, the victim testified that she was a junior in high school and that she had "all A's right now." She stated that she met the person who helped her escape while playing an online video game and that they began devising a plan soon after her fourteenth birthday. She said that she recorded the Defendant's abuse because she did not think anyone would believe her. The victim noted that her mother did not believe her. The victim said as a result, the victim needed "visible proof."

Upon examination by the trial court, the victim testified that "[w]e are getting me back into therapy" and that she was looking for a therapist at the time of the sentencing hearing. The victim said she had previously been treated at Claiborne County Children's Association for about two years and that her treatment there ended about one year before the hearing. When asked if she suffered from any kind of long-term mental distress because of the abuse, the victim stated that she was angry, that thinking about the abuse made her sad, and that "[i]t's very overwhelming." She said that she had lived with her foster parents and foster siblings for three years but that her three siblings lived elsewhere. She said her current home environment was good.

The Defendant's adult son testified that although it was "not gonna look like he's a good man, [the Defendant] was a good father." The Defendant's son believed that although his father had committed these offenses, his father could "change and become . . . a good person again." The Defendant's son said that his father taught him respect and how to operate a business. The Defendant's son owned two businesses and real estate. He said he also learned, generally, how to be a good person from the Defendant.

-4-

On cross-examination, the Defendant's son testified that his parents divorced when he was age four. He said that he had lived with his mother through the week and that he had lived with the Defendant, the victim's mother, the victim, and the victim's siblings on the weekends and during the summer months. The Defendant's son said that he never witnessed any abuse and that he would defend his father "till the end."

The trial court found that the victim was "brave, strong, and courageous" and found that it took strength to make a video recording in order for there to be evidence of what she had experienced. The court credited the victim's testimony in its totality and noted that she "exhibited good character," was intelligent, and "exhibited an appropriate amount of emotion." The court found that this was "an extremely aggravated case" and that the video recording corroborated the victim's testimony.

The trial court found that although everyone makes mistakes, this "level of malady and prolonged and sustained intent to violate his adoptive daughter and to violate the law is beyond the pale of any type of standard of decency, of humanity." With regard to the video recording created by the victim, the court noted the definition of penetration and found that the evidence showed "full on aggravated to an excessive degree." The court placed little weight on the Strong-R Assessment. The court found that "this was [of] a prolonged nature" based upon the victim's credited testimony and that the Defendant only lived in Tennessee for a short period of time before the victim stopped the abuse. Based upon the victim's testimony that she witnessed the Defendant abuse her sister, the court found that the risk of recidivism was not low. The court determined that the Defendant was "a danger to any minor female" with whom he came in contact.

The trial court discredited the Defendant's statement during the presentence investigation that the offenses were the result of his drinking alcohol excessively and found that the Defendant lacked candor and truthfulness in this regard. The court found that the Defendant had not comprehended the impact his conduct had on the victim and that the Defendant had destroyed a parental relationship when he was the only father in her life. The court, likewise, found that the Defendant's presentence statement did not reflect remorse or an acknowledgement of the "solemn gravity of the situation."

The trial court considered the statistical information on sentencing practices for sexual offenses. The court found that the nature and characteristics of the criminal conduct was horrifying, shocking, and reprehensible and was offensive, excessive, and exaggerated to such a degree that "makes these rapes . . . (brief pause) . . . about as horrible as this Court has ever seen or witnessed in 17 years of criminal law practice." The court found that the Defendant's criminal conduct outweighed any mitigation. *See* T.C.A. § 40-35-113 (2018). The court, though, applied mitigating factor (13) because the Defendant had pleaded guilty and accepted responsibility for his conduct. *Id*. § (13).

The trial court applied two enhancement factors. The court applied factor (1) based upon the Defendant's previous convictions. *See id.* § 40-35-114(1) (2018) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]"). The court determined that this factor weighed heavily against the Defendant. The court likewise determined, based upon the victim's testimony, that the Defendant had a prior history of criminal behavior in that he "groomed and molested" the victim throughout his entire relationship with her and engaged in similar conduct with the victim's sister.

The trial court applied enhancement factor (7) based upon the victim's testimony and the video recording reflecting the sexual abuse. *See id.* § 40-35-114(7) ("The offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement[.]"). The court found that the Defendant committed these acts "multiple times a day, just repeated, consistent, often." The court noted the "shocking level of conduct" and found that this was an "exaggerated crime." The court determined that the enhancement factors significantly outweighed the mitigation.

The trial court found that the Defendant did not have a potential for rehabilitation, citing the lack of evidence that "anyone who has an attraction to minors being able to cover such with treatment." The court stated that it was unaware of any rehabilitation program for a person who had a sexual attraction to girls between the ages of three and fourteen.

The trial court determined that consecutive sentencing was warranted based upon the Defendant's convictions for two or more offenses involving sexual abuse of a minor with consideration of the aggravated circumstances arising from the relationship between the Defendant and the victim, the time span of the undetected sexual activity, the nature and scope of the sexual acts, and the extent of the residual, physical, or mental damage to the victim. *See id.* § 40-35-115(b)(5) (2019). The court noted that the Defendant was convicted of rape by coercion, based upon the victim's being under age fifteen and the Defendant's being her adoptive father. The court determined that the Defendant's conduct was a violation of trust and any "moral code" for a how a father should treat a daughter. The court determined that the sexual contact was prolonged, which showed an intent to violate the law. The court noted that although the sexual contact only occurred in Tennessee for a short period of time, the evidence showed that multiple acts occurred in the seven-minute video recording and on multiple days. The court found, as a result, that the nature and scope of the offenses were excessive.

The trial court, likewise, determined that the Defendant's conduct resulted in residual and mental damage to the victim based upon her prior counseling and her need for continued counseling. The court noted that the victim, remarkably, was an excellent student and did not have "behavioral outbursts" but found that the sexual abuse "has had residual, extensive, traumatic, [and] mental damage."

After determining that consecutive sentencing was appropriate, the trial court considered the appropriate sentence length for the offenses. The court found that the offenses were an "extremely exaggerated" violation of the victim's trust and that the "penile intercourse penetration[] to be excessive and exaggerated beyond what other rapes might be[.]" The court found that the horrifying and reprehensible conduct rendered consecutive service consistent with the purposes and principles of sentencing.

The trial court imposed nine and one-half years for each conviction and ordered consecutive service, for an effective sentence of twenty-eight-and-one-half years at 100% service. This appeal followed.

The Defendant contends that the trial court erred by imposing consecutive service of his sentences. He argues that the evidence did not support a finding that the victim suffered residual, physical, or mental damage. He does not challenge the length of his sentences. The State responds that the trial court did not abuse its discretion.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210; *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2018).

The abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id*. A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2019). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4) (2019); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

The record reflects that the trial court's imposition of the consecutive service was based upon the Defendant's convictions for two or more offenses involving sexual abuse of a minor with consideration of the aggravated circumstances arising from the relationship between the Defendant and the victim, the time span of the undetected sexual activity, the nature and scope of the sexual acts, and the extent of the residual, physical, or mental damage to the victim. *See* T.C.A. § 40-35-115(b)(5). Because the Defendant only challenges the court's determinations relative to the residual, physical, or mental damage to the victim, we limit our review accordingly.

The record reflects that the sexual abuse made the victim angry, hurt and confused, and that, at times, she was furious. Some days for the victim were more difficult than others, and she ate and slept less on the difficult days. Although the victim had undergone mental health treatment for about two years, this treatment ended one year before the sentencing hearing. She said, though, that she wanted to resume her treatment and that she was looking for a new therapist at time the of the sentencing hearing. When asked if she suffered from long-term mental distress, she responded that she was angry, sad, and overwhelmed. Despite this, the victim, a junior in high school, had exceptional grades and lived in a good home environment at the time of the hearing. The Defendant conceded during the presentence investigation that the victim would have "difficulty throughout life." We conclude that the record supports the trial court's determination that the victim suffered from residual and mental damage as a result of the abuse sufficient to support this aggravating circumstance and that the trial court did not abuse its discretion in this regard.

We note that even if the extent of the residual and mental abuse were insufficient, "not all of the aggravating circumstances listed in section 40-35-115(b)(5) 'must be present to support the imposition of consecutive sentencing.'" *State v. Doane*, 393 S.W.3d 721, 738 (Tenn. 2011) (quoting *State v. James M. Powers*, No. E2001-02363-CCA-R3-CD, 2002 WL 31387308, at *5 n.4 (Tenn. Crim. App. Oct. 23, 2002)). "Furthermore, consecutive sentences may still be appropriate under section 40-35-115(b)(5) even when one factor militates against them if the other aggravating circumstances have been established and carry sufficient weight." *Doane*, 393 S.W.3d at 738 (citing *State v. Matthew Kirk McWhorter*, No. M2003-01132-CCA-R3-CD, 2004 WL 1936389, at *46 (Tenn. Crim. App. Aug. 30, 2004) (concluding that consecutive sentences were appropriate, although "[n]o evidence was presented of any 'residual, physical and mental damage to the victim'" when the other aggravating circumstances were supported by the evidence).

In any event, we conclude that the trial court did not abuse its discretion by imposing consecutive sentencing on the basis of Tennessee Code Annotated section 40-35-115(b)(5), based upon the Defendant's having committed two or more offenses involving sexual abuse of a minor. The record contains sufficient evidence to support a finding that the victim suffered mental and residual damage as a result of the abuse. The Defendant was

convicted of three sexual offenses against his adopted daughter. Although the abuse at issue in this case occurred within a three-week period, the victim testified that the abuse began when she was extremely young at ages two or three, that the abuse escalated over time from touching to penile penetration, and that the abuse lasted until she was age fourteen when she ran away from home. The victim recalled that between 2006 and 2019, the incidents of penetration were frequent and "several times a day." The Defendant was her adoptive father charged with her care when the offenses occurred. Likewise, the video recording of the abuse reflects the nature and scope of the sexual acts, and the nature of the abuse speaks for itself. Therefore, the trial court did not abuse its discretion by imposing consecutive sentencing. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE